UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| In Re: Petition of Olam Maritime Freight, PTE. LTD. § § § Petitioner, § § For Order Authorizing Discovery Pursuant to § Fed. R. Civ. P. 27. § § | Civil Action No.: IN ADMIRALTY, Rule 9(h) |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY
VERIFIED PETITION FOR AN ORDER TO PRESERVE
TESTIMONY AND EVIDENCE PURSUANT TO FED. R. CIV. P. 27**

On August 18, 2025, the 751-foot, Liberian flagged, bulk carrier W-SAPPHIRE (IMO 9605645), carrying coal on the Patapsco River, near Baltimore, Maryland, suffered an explosion ("the Incident") in its cargo hold.

Petitioner Olam Maritime Freight, PTE. LTD. ("Olam"), pursuant to Fed. R. Civ. P. 27, requests that this Court order the preservation of testimony and evidence – and the subsequent testing of evidence - relevant to the Incident. Specifically, Olam seeks an order directing the immediate sampling and testing of coal related to the Incident, disclosure of evidence related to video monitoring and gas monitoring at the CSX Transportation, Inc.'s ("CSXT") facility, and testimony concerning the loading of coal at CSXT's facility.

Olam meets the conditions of Fed. R. Civ. P. 27. Once the conditions of Rule 27 are met, the Court may also issue orders under Fed. R. Civ. P. 34. *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 55–56 (9th Cir. 1961); *see also Petition of Thomas,* 155 F.R.D. 124, 126 (D. Md. 1994).

As detailed herein, and in the attached affidavits of Olam's experts, Jack Grinwis and Dr. John Athernon – Exhibit 1 and 2, respectively, hereto – immediate sampling and testing of the coal is necessary to enable Olam – and other interested parties – to preserve, and timely test

evidence. Delays in sampling and testing may result in changes to the properties of the coal at-issue, and thus, will potentially impede the party's ability to investigate and determine the cause of the Incident and – the Court's ultimate potential determination of - liability.

It is necessary for this Court to intervene now. On September 26, 2025, Vessel Owners provided legal interests of the cargo with a Friday morning deadline (September 26, 2025) to submit any other proposal(s) for the discharge of the cargo, or to notify Vessel Owners if cargo interests want to take responsibility for the discharge of the cargo. The Vessel Owners provided a quote/unexecuted contract with their correspondence which suggests that the discharge will start on or about Saturday, September 27, 2025.

Vessel Owners' correspondence also references Olam's – and other interested parties' – discussion on sampling and testing as "completely irrelevant…" It – of course – is very relevant.

In whole, Vessel Owner's correspondence suggests that they will unilaterally off-load cargo, and that they intend to do so before samples are appropriately obtained and preserved. Offloading without obtaining samples (both before and during the offloading process) risks commingling the cargo from the various holds, contaminating it, and impacting the ability to sample the various levels of cargo. *See* Grinwis Dec., Exhibit 1.

Finally, despite preservation demands, Javelin Global Commodities (UK) Ltd. ("Javelin") (the purported owner of the coal at the time of loading) and CSXT failed to preserve the stockpile of Javelin coal at CSXT's facility from which CSXT loaded W-SAPPHIRE.

Perpetuating the specific testimony and evidence detailed herein will prevent a failure or delay of justice. This Court should immediately grant Olam's petition.

**Jurisdiction**

This Court has jurisdiction, pursuant to Rule 27(a) of the Federal Rules of Civil Procedure, as the Incident occurred in the Port of Baltimore, evidence sought to be preserved is within this District, and any anticipated action is properly maintainable in this Court under federal admiralty and maritime jurisdiction, 28 U.S.C. § 1333. *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 484–85 (4th Cir. 1999) quoting *Mosseller v. United States,* 158 F.2d 380, 382 (2d Cir.1946)("Because the rule's purpose 'is not the determination of substantive rights, but merely the providing of aid for the eventual adjudication of such rights in a suit later to be begun,' it is designed to 'afford a simple ancillary or auxiliary remedy to which the usual federal jurisdictional and venue requirements do not apply.'")

Venue is proper in the District of Maryland, as the events at issue occurred within this District at the Port of Baltimore.

**Background Facts**

*The Parties*

(1) The owners "("Vessel Owners") of the Liberian flagged W-SAPPHIRE (IMO 9605645) ("Vessel") are Linville LP, a company with an address in Monrovia, Liberian, and the Vessel's manager is W Marine Inc., a Greek company ("Vessel Manager"). The Vessel was initially anchored north of the Bay Bridge and, on or about September 17, 2025, shifted anchorage to Cove Point Anchorage. The Vessel is /or has been subject to a Coast Guard Captain of the Port Order restricting its movement.

(2) Petitioner Olam, a Singapore Private Limited Company, is the head charterer of W-SAPPHIRE.

(3) Mercuria Shipping SARL ("Mercuria) is the sub-charterer of W-SAPPHIRE. Mercuria is a limited liability company that maintains a principal office location in Geneve Switzerland. Olam is back-to-back with Vessel Owners and Mercuria in the charterparty chain, meaning that the obligations between Vessel Owner and Olam mirror the obligations between Olam and Mercuria.

Both charterparties require London arbitration.   There is, however, no requirement for Olam to arbitrate with any other party - as further detailed herein - and thus, litigation in U.S. District Courts – and specifically the District of Maryland - is cognizable.

(4) Javelin Global Commodities (UK) Ltd ("Javelin") is, on information and belief, a UK company. Javelin is the sub-sub charterer of W-SAPPHIRE and owned the coal transported to and loaded by CSXT onto the Vessel from its Baltimore facility.  Javelin is represented in this matter by legal counsel - Tydings & Rosenberg, LLP - that maintains an office in Baltimore.

(5) CSX Transportation, Inc. ("CSXT") is a Virginia corporation registered to do business in Maryland, with a principal office in Baltimore, MD and with a resident agent in Lutherville-Timonium, Maryland.  It operates a Baltimore facility that receives and loads coal onto vessels for export.   CSXT is represented by Holland and Knight – Vincent Foley and William Byrne.

(6) Ultratech Cement Limited ("Ultratech") is an Indian cement company.  Upon information and belief, title to the coal cargo onboard the Vessel transferred to Ultratech.  Ultratech appointed a local marine surveyor – International Cargo Surveyors, Inc., which maintains an office location, and resident agent, in Baltimore, MD - to represent its interest.   Further,

Ultratech purchased the coal cargo onboard the W-SAPPHIRE in this District. It is further represented by John Sullivan of Hill Rivkins LLP.

(7) Sampling Associates International ("SAI") is a Virgina stock corporation that operates the mechanical sampling equipment at CSXT's Baltimore facility. It is not, however, registered to do business in Maryland.

(8) SGS North America Inc. ("SGS") is a Delaware corporation that is registered to conduct business in Maryland, with an assigned Maryland registered agent. It provides laboratory testing.

(9) CSSC ROTTERDAM is a bulker carrier that arrived at CSXT's Baltimore facility on August 22, 2025, loaded Javelin-owned coal from the same pile from which CSXT loaded the W-SAPPHIRE, and departed on or about August 25, 2025, enroute to India.

## *The Incident*

The W-SAPPHIRE arrived at CSXT's Baltimore facility on August 16, 2025. CSXT loaded Javelin-owned coal onto W-SAPPHIRE from a shore side coal pile. W-SAPPHIRE departed CSXT's terminal on August 18, 2025. W-SAPPHIRE experienced an explosion in hold number 2 around 6:30 pm on August 18, 2025. The explosion resulted in W-SAPPHIRE losing one of its hatch covers overboard, and temporary closure of the port. Again, W-SAPPHIRE remains anchored – as of this filing – and has not delivered its cargo to its destination.

## *SGS Samples*

During the loading process, a SAI-owned mechanical sampling system took samples of coal by or under the direction of Javelin and/or CSXT, in accordance with standard procedures for quality control and contractual compliance. The samples were placed in plastic storage bags and sealed in plastic storage tubs. Here – the samples were placed in three bins labeled 49, 50,

and 56, which were than provided to SGS on August 19, 2025 (herein "SGS samples"). Javelin's counsel provided a photo of these samples – below - to interested parties:



SGS – on behalf of Javelin - conducted independent testing on some of the coal samples without observation of, or input from, Olam or any other interested party. Besides not being witnessed, SGS's initial testing is inadequate because it failed to conduct various relevant tests necessary to evaluate the cause of the Incident, including, but not limited to, coal self-heating, volatile matter, or flammable gas emissions. These SGS samples must be fully tested immediately.

Javelin has agreed to a joint testing of the SGS samples – as further detailed below.

*Sample Testing*

On or about August 27, 2025, Mercuria's experts provided a proposed sampling protocol to Vessel Owners, Olam, Javelin, and CSXT. Olam's experts discussed this plan with Mercuria.

On September 11, 2025, Mercuria again approached Javelin and Olam about conducting a joint analysis of the retained coal samples.

On September 12, 2025, Javelin's counsel contacted Mercuria's and Olam's counsel and suggested the following joint- testing regiment:

1. HRT laboratory to determine the moisture content on sub-samples from each sample bag.
2. HRT to analyse for proximate and ultimate analysis.
3. Sub-sample to be delivered to Dekra, and Dekra to determine gas emission rate, total quantity of gas, and conduct a self-heating test.

Javelin further suggested – and Olam agrees - the parties' various experts should discuss and agree on protocols amongst themselves.  Javelin also indicated that it would notify Vessel Owners of the plan too – which it did – along with CSXT's counsel – on September 12, 2025. CSXT subsequently agreed to participate in and share testing costs.

In addition to the above tests, Olam also believes that it is necessary to have Dekra conduct evolved gas analysis to determine composition of the gas.  The parties are still discussing testing and protocols.  Testing of the SGS samples, however, must be completed without future delay. A court-imposed deadline will ensure timely testing.

### *CSXT's and Javelin's Failure to Preserve Coal Pile at Terminal*

In addition to the SGS samples, there was a pile of coal at the CSXT facility from which CSXT loaded the W-SAPPHIRE.

Both CSXT and Javelin knew – and were on notice of - Olam's desire to sample and test the coal pile, and of its legal obligation to preserve it while the coal pile was onboard CSXT's facility.

On or about August 22, 2025, the CSSC ROTTERDAM arrived as CSXT's facility. Javelin and/or CSXT loaded the CSSC ROTTERDAM with Javelin-owned coal from the same pile from which CSXT loaded the W-SAPPHIRE. The CSSC ROTTERDAM departed on or about August 25, 2025, enroute to India.

On August 27, 2025, at CSSC ROTTERDAM's departure, Javelin's counsel notified Olam (and others) that during the loading process of the CSSC ROTTERDAM, CSXT – using the same pile from which it had loaded the W-SAPPHIRE - completely cleared out the cargo stockpile that had been residing on the CSXT terminal.

### *CSSC ROTTERDAM Samples*

Upon information and belief, SAI took samples of the cargo loaded onboard the CSSC ROTTERDAM. SGS is retaining these samples (herein "ROTTERDAM samples") at the request of Javelin.

Olam requested that Javelin provide the results of any initial testing on the ROTTERDAM samples. Javelin declined. Olam also requested that the ROTTERDAM samples be included in any joint testing amongst the parties. Javelin again refused. Javelin contends that the ROTTERDAM samples are not relevant to the Incident.

Considering Javelin's and CSXT's failure to preserve the subject coal pile, these samples are significant and must be immediately tested.

### *Shipboard Coal Samples and Off-Loading Plan*

Coal remains onboard the W-SAPPHIRE. Again, W-SAPPHIRE remains anchored – as of this filing – and has not delivered its cargo to its destination. Coal onboard the W-SAPPHIRE (herein "SAPPHIRE coal") must be immediately tested.

As detailed above, Vessel Owners – unilaterally – and in their own interests - have deemed the sampling and testing desired by Olam – and others - irrelevant. Vessel Owners are taking steps to offload the W-SAPPHIRE cargo without adequate sampling, risking commingling and contamination of the cargo. Specifically, the Vessel Owners apparently completed a cargo offload/lightering plan that indicated an intent to offload cargo at anchorage using a floating crane to a hopper barge. Once the hopper barge is loaded, the coal will then be taken to Tradepoint Atlantic at Sparrows Point, Maryland for further offloading shoreside. The process will repeat until all the coal is off the W-SAPPHIRE. There is no reason samples can't be obtained before and during this process.

Allowing the vessel to be offloaded before sampling would deprive Olam of a chance to obtain evidence necessary to protect its interests in the potential proceedings in Maryland and other U.S. District Courts. Olam, therefore, requests the opportunity to sample the W-SAPPHIRE coal cargo – from each hold - while the Vessel is anchored, and then again during the offloading process. Olam commits to obtaining all evidence swiftly and without impact on the Vessel's operations.

Sampling should be performed before potential contamination of the W-SAPPHIRE coal during the lightering process, and throughout it.

<em>Other Evidence in the Possession of CSXT</em>

On September 10, 2025, Olam requested CSXT provide Olam a copy of any video footage, including security cameras, depicting: (1) the W-SAPPHIRE's arrival, loading, and departure from CSXT's terminal; and (2) the CSSC ROTTERDAM's arrival, loading, and departure from CSXT's terminal. This evidence is critical to evaluating the potential – and

apparent - spoliation of evidence. It is also relevant to the loading sequence and ventilation of the cargo.

Olam also understands that CSXT terminal - to include at least its North and South Reclaim Tunnels – are installed with a fixed gas detection system to monitor for methane. Olam requested CSXT produce the following from the gas detection system for the period of time from when the coal loaded onto the W-SAPPHIRE arrived at CSXT's facility until August 27, 2025: (1) Alarm and Event Logs; (2) Incident Reports (Automated or Manual); (3) Trend and Data Logging Reports; (4) System Health and Maintenance Reports; and (4) Compliance and Audit Reports.

On September 12, 2025, CSXT – through counsel – declined to make a voluntarily production of the requested evidence.

### *Time is of the Essence*

While true the coal will continue to exist in a physical sense for a long period of time, its relevance may not. Grinwis Dec., Exhibit 1. As more time passes, the characteristics of the coal could evolve and change from its present state. The longer from the incident – the more likely the testing will be subject to challenge, or that the coal test results will produce results that do not reflect the characteristics of the coal at the time of the Incident.

The Vessel Owners have indicated that the subject coal is producing a significant amount of methane. Vessel Owners have not permitted Olam – or others - to sample and test the coal onboard. A potential high rate of methane emission – if accurate – may suggest that CSXT or Javelin blended the coal onboard the W-SAPPHIRE. *Id.* Testimony is necessary from Javelin and CSXT personnel on this issue.

Vessel Owners' assertions further add urgency to the need to immediately sample and test the coal.

### *Coast Guard Port State Control Report*

On August 23, 2025, the Coast Guard issued a Port State Control Report of Inspection – Form A detaining the W-SAPPHIRE. The associated Form B noted several deficiencies, including that W-SAPPHIRE did not have operable gas detection equipment onboard, and even after the explosion, it failed to ventilate its holds to prevent the accumulation of methane. This calls into question the reliability of any pre- and post-Incident gas monitoring (of methane produced by the coal) conducted by Vessel Owners.

Publicly available photographs, and video of the Incident, also suggest that the Vessel failed to ventilate the cargo holds during its departure from CSXT.

### *Ship Inspection*

Vessel Owners have also refused to allow crew depositions, produce documents related to the Vessel and cargo requested by Olam, permit a full inspection of relevant Vessel conditions and systems by Olam – and others, or sampling of the cargo onboard. This has prevented Olam from conducting a full investigation into potential Vessel-based factors into the Incident.

Because of the arbitration provision between Vessel Owners and Olam, Olam litigation between the two in a United States court is not cognizable and thus, Olam cannot leverage Rule 27 against Vessel Owners. It must focus – for now – on the coal.

### **LEGAL STANDARD**

Fed. R. Civ. P. 27 provides that "[a] person who wants to perpetuate testimony about any matter cognizable in a United States court may file a verified petition in the district court for the

district where any expected adverse party resides." Fed. R. Civ. P. 27(a)(1).  The petition must show:

> (A) that the petitioner expects to be a party to an action cognizable in a United States court but cannot presently bring it or cause it to be brought;
> (B) the subject matter of the expected action and the petitioner's interest;
> (C) the facts that the petitioner wants to establish by the proposed testimony and the reasons to perpetuate it;
> (D) the names or a description of the persons whom the petitioner expects to be adverse parties and their addresses, so far as known; and
> (E) the name, address, and expected substance of the testimony of each deponent.

*Id.*

A court may issue an order under Rule 27 "if it is satisfied that a failure or a delay of justice may thereby be prevented." *Mosseller v. United States, 158 F.2d 380, 382 (2d Cir. 1946)*; *see* Fed. R. Civ. P. 27(a)(3). The Rule has been held to apply in admiralty cases. *Id.* "Rule 27 properly applies only in that special category of cases where it is necessary to prevent testimony from being lost." *Application of Deiulemar Compagnia Di Navigazione S.p.A.* at 484 (4th Cir. 1999) citing *Ash v. Cort,* 512 F.2d 909, 911 (3d Cir.1975).

In circumstances where a vessel was expected to leave the court's jurisdiction or similar emergencies, courts have granted similar petitions without strict adherence to the twenty-day notice provision of Rule 27. *See Application of Deiulemar Di Navigazione S.p.A.,* 153 F.R.D. 592, 593 (E.D. La. 1994) (allowing less than 21 days (than 20 under the rule) notice due to adverse party being represented by counsel); *see also In re Petition of Chao*, 2008 WL 4471802 at 2 (N.D. Iowa Oct. 2, 2008) (allowing less than 21 days (than 20 under the rule) notice due to deportation).

Rule 27 permits vessel inspection, observation of repairs, and copying of documents. *Application of Deiulemar Compagnia Di Navigazione S.p.A.* at 484 (4th Cir. 1999) (affirming district court's order granting the Rule 27 petition and allowing petitioner to "inspect the vessel,

observe repairs, and copy documents from the ship."). It also allows for evidence sampling and testing, and other actions. *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 56 (9th Cir. 1961) ("party may, in a proper case, proceed under Rule 27 for an order under Rule 34 without taking a deposition at all")("of course, the showing required by Rule 27 must first be made before Rule 34 comes into play. But once that showing is made, then the rule of liberal construction should apply."); *see also Petition of Thomas*, 155 F.R.D. 124, 126 (D. Md. 1994) ("the State contends that Rule 27 only allows the taking of *depositions* prior to the filing of an action. The Court rejects the State's contention… in the name of fairness, judicial economy, and simple common sense, relevant evanescent evidence capable of preservation should be preserved so that arguments and decisions can be made with reference to the best and fullest evidence available.") (italics in original, underline added)(also therein favorably citing and quoting *Martin*); Fed R. Civ. P. 27 (a)(3) ("the court may issue orders like those authorized by Rules 34 and 35); Fed. R. Civ. P 34 (permits requests for inspection, testing, and sampling of evidence).

## ARGUMENT

### Olam is Entitled to an Order Pursuant to Fed. R. Civ. P. 27

Olam satisfies the requirements of Fed. R. Civ. P. 27.

As to the first two factors, Olam reasonably anticipates litigation (and arbitration) over the costs associated with Incident to include vessel repairs, vessel delays/loss of use, cargo delivery delays, and potential degradation to the quality of the cargo. Further, as noted above, the Incident resulted in the closure of the port, potentially giving rise to other unknown claimants impacted by the closure. *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 484–85 (4th Cir. 1999)("A petitioner does not have to demonstrate a cognizable action with absolute certainty.")(citation omitted).

In the aftermath of the explosion, the Vessel Owners have contended that the coal cargo is dangerous and unsafe for carriage to its destination. As such, a significant focus of anticipated lawsuits – and liability for damages - will be on the quality, condition, and characteristics of the coal cargo loaded aboard the M/V W-SAPPHIRE.

Vessel Owners will seek to recover from Olam under the Charterparty. Again, while Olam is back-to-back with Vessel Owners and Mercuria in the charter party chain, and subject to arbitration with those parties, Olam is not subject to any arbitration requirement with the cargo owners (Javelin (at loading) or Ultratech (onboard the vessel)) or CSXT. Olam will need to look to litigation in U.S. District Court to recover – as necessary – against these adverse parties.

Because the quantum of claims has not yet finalized - including any claims again Olam by Vessel Owners or Mercuria in arbitration – Olam is not presently positioned to bring claims against multiple potential adverse parties, including Javelin, Ultratech, and CSXT for contribution or indemnity.

As to the third requirements, Olam wishes to establish the following facts:

(1) The quality, condition, and characteristics of the coal cargo loaded aboard the W-SAPPHIRE. This will be established by: (a) testing the SGS Sample; (b) testing the ROTTERDAM sample; and (c) sampling and testing coal in the cargo holds of the W-SAPPHIRE. Further, methane emissions from the coal may also be evidenced from the gas monitoring equipment – and the associated reports at the CSXT facility. This gas monitoring information is particularly relevant because - as detailed in the Coast Guard report – the Vessel did not have operational/properly calibrated gas monitoring equipment at the time of the Incident.

(2) Document if the coal was blended and if so, if it occurred prior to arrival or at the CSXT facility. This will be established by the testimony of CSXT's representative, testimony of Javelin's corporate representative, and CSXT video surveillance.

(3) Document that loading sequence and, if the coal was adequately ventilated onboard the W-SAPPHIRE while at the CSXT facility. This will be established by the testimony of CSXT representative and video surveillance.

(4) Document the loading sequence and ventilation on CSSC ROTTERDAM – to determine if there was a difference in how the two vessels handled the coal, or how CSXT loaded the coal. The CSSC ROTTERDAM has had no known issues with coal. This will be established by the testimony of CSXT representative and video surveillance.

It is necessary to perpetuate this testimony because – as detailed above – the characteristics of the coal change over time. The coal – and samples of it - constitute material evidence necessary for resolution of the anticipated dispute, and such evidence may be lost, altered, or degraded unless preserved through Court order and timely testing.

Further, Vessel Owner's apparent plan to offload cargo from the Vessel via floating crane and barge, before any sampling, risks potential commingling of, and contamination to, the coal onboard before it is adequately preserved.

Finally, Olam's potentially adverse parties – Javelin and CSXT – failed to safeguard evidence in the case – the coal pile – and Olam is entitled to ensure further relevant evidence is safeguarded.

As to the fourth and fifth factors, Olam has detailed the physical evidence it seeks herein. As to testimony, Olam seeks the deposition of CSXT's corporate representative(s) and Javelin's corporate representative – as relevant - with knowledge of: (1) the loading sequence/ventilation

of W-SAPPHIRE and CSSC ROTTERDAM; and (2) knowledge as to whether the coal was blended.

## CONCLUSION

This Court should immediately order testing and sampling of the coal onboard the W-SAPPHIRE before – and during - its offload to ensure such evidence is adequately preserved without the threat of contamination or commingling.

This Court should also enter an order requiring Javelin and CSXT to produce the already-preserved coal samples for inspection, sampling, and scientific testing under conditions set by the Court. Immediate sampling and testing of coal related to the Incident onboard the W-SAPPHIRE is necessary to ensure that the test results reflect the characteristics of the coal at the time of the Incident.  Delays in sampling and testing create a risk of irreparable loss of critical physical evidence.  The Court should direct the parties to agree to a joint testing protocol and submit samples for testing before October 1, 2025.  Without such testing, Petitioner and other potential parties will be prejudiced in their ability to bring or defend claims regarding the coal shipment.

Further, this Court, due to Javelin's and CSXT's failure to preserve the coal pile for potential testing, should order the depositions of Javelin's and CSXT's corporate representatives to testify as to: (1) whether the coal was blended; and (2) the loading sequence – and ventilation - of the coal on the W-SAPPHIRE and CSSC ROTTERDAM.

Finally, CSXT should be ordered to produced relevant evidence – especially any videos of the arrival, loading, and departure of the W-SAPPHIRE and CSSC ROTTERDAM, and gas

monitoring information from its CSXT facility in August 2025.

Dated: September 26, 2025.

/s/ J. Stephen Simms
J. Stephen Simms (04269)
Gary C Murphy (31057)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
Telephone: 410-783-5795
jssimms@simmsshowers.com
gcmurphy@simmsshowers.com

Counsel to Olam Maritime Freight PTE. LTD.