UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| In Re: Petition of Olam Maritime Freight, PTE. LTD. | : | Civil Action No.: 1:25-cv-03195-MJM |
| | : | |
| | : | IN ADMIRALTY |
| Petitioner, | : | |
| | : | |
| For Order Authorizing Discovery Pursuant to Fed. R. Civ. P. 27 | : | |
| | : | |
| _____ | : | |

### AFFIDAVIT OF MARTIN JONAS

I, Martin Jonas, declare pursuant to 28 U.S.C § 1746 that I have personal knowledge of the following statements and that they are true and correct.

1. I am over 18 years of age and competent to testify to the matters stated herein.

2. I am one of the experts retained on behalf of Linville LP, the owner of the M/V W-SAPPHIRE, to provide advice and expert opinion in connection with the methane levels emitted from the cargo of coal loaded aboard the W-SAPPHIRE between August 16-18, 2025, at Baltimore, Maryland and with the subsequent explosion in hold #2 on August 18, 2025.

3. I am submitting this Affidavit in opposition to the Petition by Olam Maritime Freight, PTE LTD ("Olam") for an Order to take and test samples of coal from the W-SAPPHIRE, as well as other samples of coal at the CSX terminal, because it is my opinion that the results of any testing would be meaningless and misleading because the current characteristics and methane levels of the coal will have changed substantially from the characteristics and methane levels of the coal at the time of the explosion, as further detailed below.

4. I am a physicist with a First Class Diplom degree from Cologne University and an MPhil and PhD from Cambridge University, where I have carried out academic research in the Departments of Physics and Plant Sciences. I am a Chartered Physicist and a Member of the

Institute of Physics. I have specialised full-time as a forensic cargo scientist since 1998 investigating the cause and effect of cargo-related marine casualties and claims. I am currently the Director of Science at Brookes Bell UK, heading the UK-based team of cargo scientists and fire/explosion investigators. A major part of my work concerns advice on hazardous cargoes, including liquefaction and fire/explosion risks, and the IMO regulations governing their carriage in the IMSBC and IMDG Codes. I am the co-author of a textbook on the carriage of bulk cargoes, which includes a chapter on the hazards and regulatory requirements for the safe ocean carriage of coal. I have been advising on managing self-heating and methane emission hazards of coal for over 25 years and more than 300 separate coal cargoes, including many incidents of fire and/or explosion.

5.  I have read the Declarations of Jack Grinwis and John Atherton submitted on behalf of Olam and agree with their opinion that the physical and chemical properties of coal change over time due to natural processes.

6.  However, I disagree with Messrs. Grinwis and Atherton that testing samples of the coal aboard the W-SAPPHIRE so long after the August 18 explosion would be directly relevant to any claims that may arise out of this incident.

7.  The August 18 explosion in #2 hold of the W-SAPPHIRE was due to excessive and dangerous levels of methane within #2 hold. In order for the results of testing of any samples of coal to be relevant or material to potential claims, it must be shown that there is a scientific basis to conclude that the test results of levels of methane emission from the coal samples taken now would be representative of the levels of methane emission from the coal at the time of the explosion.

8.       In my professional judgment, due to the effects since August 18 of natural processes on the coal aboard the vessel, any tests for the levels of methane emission that could be conducted now or in the future would not produce results that are representative of the levels of methane emission of the coal aboard the W-SAPPHIRE at the time of the explosion.

9.       Coal does not produce methane – rather, methane is a separate product generated at the same time the coal is formed, and the methane remains trapped within coal formations. Because methane is lighter than air methane will dissipate when it can escape from within the piles of coal.  We know that the coal aboard the W-SAPPHIRE has been releasing methane since it was loaded aboard the ship and therefore any tests for methane emissions taken now or in the future would necessarily be significantly different than those that would have been present on August 18.

10.      The coal that was loaded aboard the W-SAPPHIRE was carried via conveyor from stockpiles on the pier and then dropped into each cargo hold from an overhead spout.  The process of loading coal aboard the vessel causes increased rates of methane emission from fresh fracture surface which forms as the coal is dropped several meters into the cargo holds and methane trapped within the coal is released into the atmosphere.  As a result, in my professional judgment the highest levels of methane emission from the coal on the W-SAPPHIRE would be in the period immediately after the coal was loaded.

11.      On the other hand, the coal presently in the cargo holds of the W-SAPPHIRE has been at rest for at least 50 days.  It will have lost a significant proportion of the original methane it contained at the time of loading.

12.      In addition, any samples drawn from the static coal while it remains within the holds of the W-SAPPHIRE would not be representative of the average properties and quality of the entire cargo on board.  To the contrary, any samples can only be drawn from the accessible

cargo at or near the surface of the coal. This accessible cargo will have lost proportionally the highest amount of the original methane it contained at the time of loading compared to the cargo at further depths within the cargo holds.

13. The process of sampling itself causes the release of much of the residual methane remaining in the samples. There is no recognized method of sampling coal that would preserve residual methane levels.

14. Therefore, any results of testing of this static coal would in my professional opinion not be representative of the levels of methane that would have been emitted from the coal during and immediately after the coal was loaded on August 18.

15. The declarations of Messrs. Grinwis and Atherton refer to "testing" of samples of the coal to be taken from the holds of the W-SAPPHIRE but provide no details of how those tests will be performed. Neither of them say in their declarations that levels of methane emissions measured in samples drawn from the vessel now would be representative of the levels of methane emissions from the coal in hold #2 shortly before the explosion.

16. I am not aware that there are any standardized methods for testing levels of methane emission from samples of coal taken from a loaded ship, and there are no benchmarks or comparisons with other coal cargoes available because this is not the type of test that is systematically carried out on samples of coal. Absent any standardized testing method or benchmarks, the "testing" proposed by Olam will not provide evidence whether this was a "normal" cargo in terms of methane hazard, nor would the proposed "testing" tell us anything about the rate of methane emission from the loaded cargo on board the vessel on August 18.

17. I am also not aware of any scientifically recognized method whereby readings of methane levels taken today can be extrapolated to provide an accurate measure of what the

methane levels were on a prior date due to the variety of factors that could influence the rates of emission of methane in the interim.

18.   For the reasons set forth herein it is my professional opinion to a reasonable degree of scientific certainty that the results of any testing for levels of methane emission from samples taken in October 2025 or thereafter from the coal cargo on the W-SAPPHIRE would not be representative of the levels of methane emission that were present in hold #2 on August 18, 2025 immediately before the explosion, and that the results of testing performed now or hereafter would be misleading and irrelevant to the issues involved here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 3 October 2025.

_____
Martin Jonas

#727668v1