IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN RE: Petition of Olam Maritime Freight, PTE. LTD. | * | |
| | * | |
| Petitioner | | |
| | * | Civil Action No: 1:25-cv-03195-MJM |
| For Order Authorizing Discovery Pursuant to Fed. R. Civ. P. 27 | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**JAVELIN COMMODITIES MEMORANDUM IN OPPOSITION TO THE
RULE 27 PETITION OF OLAM MARITIME FREIGHT
<u>FOR ORDER AUTHORIZING DISCOVERY PURSUANT TO FED. R. CIV. P. 27</u>**

Respondent Javelin Commodities ("Javelin"), by and through its attorneys, Alexander M. Giles and Tydings & Rosenberg, LLP, hereby files this Memorandum in Opposition to the Emergency Verified Petition for an Order to Preserve Testimony and Evidence pursuant to Fed. R. Civ. P. 27, filed herein by Petitioner Olam Maritime Freight, PTE. LTD ("Olam"), and states in support as follows:

Despite their arguments to the contrary, Olam's Rule 27 Petition does ***not*** meet the conditions required by Rule 27 of the Federal Rules of Civil Procedure, exigent circumstances are not presented by the underlying facts of this incident, the other parties involved in this incident have preserved and maintained relevant samples that are arguably most reflective of the conditions and characteristics that existed as of August 18, 2025, those same parties have been working collaboratively to come up with mutually agreeable sampling and testing protocols, and, therefore, immediate court intervention is ***<u>not</u>*** necessary.

6455696.1

## FACTUAL BACKGROUND

The M/V W-SAPPHIRE, a 751-foot, Liberian flagged, bulk carrier (IMO 9605645) (hereinafter, "the Vessel") arrived into the Port of Baltimore on or about August 16, 2025, for the explicit purpose of loading a cargo of coal from the CSX Transportation, Inc.'s ("CSXT") Curtis Bay coal pier and terminal facility.

During the loading process, Sampling Associates International ("SAI") in conjunction with SGS North America, Inc. ("SGS") took samples of the coal being loaded onto the Vessel. The samples were placed in plastic storage bags and sealed in plastic storage tubs. As stated by Olam in its Memorandum of Law in Support of Emergency Verified Petition, at pp. 5-6 (ECF No. 1-1), "the samples were placed in three bins labeled 49, 50, and 56, which were then provided to SGS on August 19, 2025 (herein "SGS samples")." SGS is still maintaining and preserving the samples in those same three bins, and will continue to do so until they are instructed to share them with all of the relevant parties for purposes of joint inspection and testing. In fact, as explicitly acknowledged by Olam in its Memorandum at pg. 6, "Javelin has *agreed* to a joint testing of the SGS samples." (emphasis added).

On August 18, 2025, the Vessel departed from the berth at CSXT and, within minutes of sailing, it experienced an explosion in Hold No. 2. As previously stated by Olam in its Memorandum at pg. 5, "the explosion resulted in W-SAPPHIRE losing one of its hatch covers overboard, and temporary closure of the port." Since the explosion of August 18, 2025, the Vessel has remained in the jurisdiction of Maryland and has split time between the Annapolis Anchorage and the Cove Point Anchorage in Southern Maryland.

## **LEGAL STANDARD FOR RULE 27**

As CSXT stated in its own Memorandum in Opposition filed in this matter, "Rule 27 is a means of perpetuating testimony before trial" which "'properly applies only in that special category of cases where it is necessary to prevent testimony from being lost.'" *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 484 (4th Cir. 1999) ("*Application of Deiulemar*") (quoting *Ash v. Cort*, 512 F.2d 909, 912 (3d Cir. 1975)). It "is not a substitute for broad discovery . . . nor is it designed as a means of ascertaining facts for drafting a complaint." *Id.* at 485–86 (collecting cases). "Rule 27 . . . is available in special circumstances to preserve testimony which could otherwise be lost," *Ash*, 512 F.2d at 912, but may not be used "to determine whether a cause of action exists; and, if so, against whom action should be instituted." *Petition of Gurnsey*, 223 F. Supp. 359, 360 (D.D.C. 1963).

A Petition should be denied where it "failed to assert reasons why it was necessary to perpetuate [the] testimony," *Ash*, 512 F.2d at 913, or where the Petitioner "fails to show that the testimony he seeks is known and *will be lost, concealed, or destroyed* unless perpetuated." *Piper v. Gooding & Co. Inc.*, No. CV-18-00244, 2018 WL 924947, at *3 (D. Ariz. Feb. 15, 2018) (emphasis added).

The Petition "must occur in the district in which the potential defendant resides." *Ussery v. Unincorporated Ass'n of "Skip" Cornelius*, No. 2:24-CV-00128, 2024 WL 3891527, at *3 (N.D. Tex. July 22, 2024), *report and rec. adopted*, 2024 WL 3891829 (N.D. Tex. Aug. 21, 2024) (denying Petition because "there is no indication that any of the defendants resides in the Northern District of Texas"); *see also Piper*, 2018 WL 924947, at *3, n.3 (expressing "serious doubts that this District would be the appropriate venue to hear such a petition").

**ARGUMENT**

**A. The Petition Should be Denied as to Javelin Because it Does Not Assert a Need to Perpetuate Javelin's Evidence or Testimony**

Olam seeks anywhere between five and six different types of evidence from Javelin: (1) testing of the SGS samples (originating from the loading of the Vessel); (2) testing of the CSSC ROTTERDAM samples; (3) sampling and testing of the coal presently located in the six (6) cargo holds of the Vessel; (4) testimony of a Javelin corporate representative to determine if/when the coal was blended, and, if so, if it occurred prior to arrival or at the CSXT facility, (5) testimony of a Javelin corporate representative regarding the loading sequence/ventilation of the Vessel and of the CSSC ROTTERDAM; and possibly also (6) sampling and testing of the coal from what is affectionately known as the "Coal Stockpile" that is located at CSXT. *See* Olam Memorandum at 14–17.

Much like CSXT stated in its Memorandum in Opposition, Olam completely fails to explain why any of these items, other than maybe Item No. 1, would be considered relevant, trustworthy, dependable, and accurate information that would help the parties and this Court to determine the possible causes of the August 18, 2025 explosion. Moreover, and maybe more importantly in the context of Olam's Rule 27 Petition seeking emergency discovery and testimony, Olam also completely fails to explain why this testimony or evidence is in danger of being lost.

Olam states in support of its Verified Petition merely that it "seeks an order directing the immediate sampling and testing of coal related to the Incident" and then subsequently simply states that "immediate sampling and testing of the coal is necessary." *Id.* at 1. Despite the requests for emergency-type remedies by Olam and its two experts, Jack Grinwis and Dr. John

Atherton, they provide absolutely no support for any reasonable grounds that would justify any such emergency remedies.

The stated justification as to why Olam felt that its Verified Petition needed to be filed on the morning of September 26, 2025, was their understanding that the Vessel Owners were intending to start the discharge and off-loading of coal from the Vessel beginning on or about Saturday, September 27, 2025.  *See* Olam Memorandum, pg. 2.  However, as was aptly stated by US counsel for the Vessel Owners during the emergency hearing that was conducted Judge Maddox on the afternoon of Friday, September 26, 2025, the document identified by Olam (even by its own description in its Memorandum at pg. 2) was a "quote/unexecuted contract" that was still in the process of being discussed and negotiated by the parties/entities involved.  *See* September 26, 2025 Emergency Hearing Transcript at p. 26, attached hereto as Exhibit 1

Furthermore, from a logistics perspective, the Vessel Owner interests were not anywhere close to starting either the off-loading/discharge process to hopper barges, as no cranes or hopper barges were in position next to the Vessel, OR a possible transshipment process, as there was no second vessel alongside the Vessel yet in order to effectively start any such transshipment operations.  Finally, US counsel for the Vessel Owner interests that he and his colleagues would provide notice to all other interests before either discharge or transshipment would occur.  *See* Exhibit 1, pp. 16-19.

Olam does not hide its goal of obtaining all of this "emergency" discovery and testimony so that it can subsequently be used in forums outside of the United States, most notably in the anticipated London Arbitration proceedings in this matter pursuant to the applicable Charterparty that exists between it and the Head Owners.  While Olam may find it useful or convenient to

have this evidence in connection with other proceedings, such as any future London Arbitration proceedings, that is not the purpose of Rule 27.

What Olam seeks from Javelin and CSXT is classic discovery, and Rule 27 is not "a substitute for general discovery." *Ash*, 512 F.2d at 913. Olam does not allege (at least legitimately) that any of the evidence from Javelin will be "lost, concealed, or destroyed unless perpetuated." *Piper*, 2018 WL 924947, at *3. Nor could Olam. Relevant documents and SGS samples are being preserved by Javelin pursuant to the legal hold notices received from multiple parties involved in this incident. Olam also fails to identify why a corporate representative's testimony must be perpetuated, and a "general allegation" is not sufficient. *See Penn Mut. Life Ins. Co. v. United States*, 68 F.3d 1371, 1375 (D.C. Cir. 1995) (Noting that "perpetuation of . . . testimony may not be necessary" where "other IRS employees can provide the same information"). Nor does Olam assert that any corporate representative has "some unique knowledge," but is aging, ill, or otherwise likely to be unavailable. *Id. See also Petition of Ford*, 170 F.R.D. 504, 507 (M.D. Ala. 1997) (denying Rule 27 Petition where "[t]here is nothing before the court to indicate that [the] testimony is in imminent danger of being lost.").

Olam makes a feeble attempt to show exigency by making vague allegations of spoliation regarding the disposition of the Coal stockpile at the CSXT Terminal. *See* Olam Memorandum at 7–8, 9–10. Olam implies that Javelin and/or CSXT destroyed or concealed evidence by failing to preserve "the coal pile." *Id.* at 15, 16. For the reasons that were discussed extensively by undersigned counsel during the emergency hearing of September 26, 2025, Javelin unequivocally disagrees with that attempt at establishing exigency and with those characterizations. *See* Exhibit 1, pp. 5-9, 28-31.

As was stated by CSXT in its own Memorandum in Opposition, the request to preserve "the coal pile" makes no logical sense, and establishes the complete lack of an adequate understanding by Olam as to how the Coal Stockpile actually works in reality.

The Coal Stockpile at CSXT is continuously replenished with coal from railcars to build up the quantity of coal necessary to load each succeeding ship. The coal in the stockpile is made up of a mix of several loads from different railcars. And the railcars on one train contributing to the stockpile may be loaded with coal coming from a different mine as compared to the train before or after. The "coal pile" is in fact a continually changing variable driven by the need to add a sufficient quantity of coal to load each incoming vessel and allow for off-loading of incoming train loads. Because of the continually changing composition, the coal in the stockpile after loading any given vessel is not the same as the coal supplied to the prior or subsequent vessel at any given moment in time. It is for that reason that samples are taken from the coal loaded onto each ship, and why the samples collected from the ship involved in the incident are the relevant coal for this dispute.

Upon information and belief, CSXT has records (which are also being preserved) that establish the amount of coal that was present in the Coal Stockpile immediately prior to the loading of the Vessel, the amount of coal that was present immediately after the loading of the Vessel, the amount of coal that was then brought in by railcars to supplement the remaining amounts of coal, the amount of coal that was present immediately prior to the loading of the CSSC ROTTERDAM, the amount of coal that was present immediately after the loading of the CSSC ROTTERDAM, the amount of coal that was then brought in by railcars to supplement the remaining amounts of coal in anticipation for the ship that followed the CSSC ROTTERDAM, and so on and so on.

For all of the reasons stated above, and for many more that have not been stated, the Petition should be denied in full as to Javelin (and CSXT) because Olam has not given any reason to perpetuate the evidence requested, and thus Olam has failed to show that "perpetuating the testimony may prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3).

### B. The only evidence that is arguably "relevant" are the SGS Samples from the M/V W SAPPHIRE

Olam's Petition lacks a certain clarity as to precisely which "coal" it is referring to at any particular point throughout its Rule 27 Petition.

However, as undersigned counsel argued extensively during the September 26, 2025 Emergency Hearing, there are essentially three (maybe four) different categories of coal that are being discussed by Olam in the context of its Rule 27 Petition – 1) The SGS samples taken during the loading operations of the Vessel at issue in this incident; 2) the SGS samples from the loading operations of the CSSC ROTTERDAM (which was the subsequent vessel loaded with coal at the CSXT Terminal facility in Curtis Bay); and 3) the coal loaded on the Vessel on or about August 17-18, 2025 that still currently resides in the six (6) holds of the Vessel. *See* Exhibit 1, pp. 28-31. The fourth possible category of coal that counsel for Olam have mentioned on occasion as being "relevant," but then backed away from such a claim and a related request for sampling and testing, but now have arguably, vaguely included it in their pleadings, is the coal that *currently* resides in the Coal Stockpile at the CSXT Terminal.

As undersigned counsel argued during the Emergency Hearing, the only category of coal that is arguably, or even possibly, relevant and that might produce helpful information in terms of sampling and testing by the parties are the SGS samples taken during the loading operations of the Vessel and related to the August 18, 2025 incident. *Id.* None of the other three categories of coal are particularly relevant.

However, in full disclosure, and in attempt to be completely candid with all counsel and with this Court, Javelin's expert John Allum has stated in Paragraph 8 of his attached Declaration, the following:

> A limitation of the SGS loading samples from the Vessel and its voyage of August 18, 2025 is that those samples are "representative samples" of the whole cargo. There are no samples for each of the individual holds. In this regard, a benefit of taking further representative samples on board the Vessel is that it should help confirm that the cargo in Hold No. 2 was the same (or very similar) to the cargo in all the other holds (i.e. the coal cargo in Hold No. 2 was not an outlier or vastly different).

*See* Declaration of John Allum, Para. 8, attached hereto as Exhibit 2.

Despite the theoretical "relevance" of the coal that currently still resides on the Vessel at issue, John Allum also made his primary thoughts known as to the "most relevant" coal samples, when he stated in his attached Declaration as follows:

> the representative samples taken from the Vessel during loading by SGS are the best samples for purposes of determining the conditions and characteristics of the coal as of the time of loading on the Vessel. However, given that the incident occurred on August 18, 2025, the coal may no longer reflect the condition of the cargo at the time of loading – especially in relation to methane.

*See* Exhibit 2, Para. 7.

Furthermore, with regard to the coal samples taken from the CSSC ROTTERDAM by SGS, John Allum stated in no uncertain terms that:

> I disagree with the premise that the coal loaded and shipped on the CSSC ROTTERDAM is relevant to the coal loaded on the M/V W SAPPHIRE. In my view, based on my understanding of the terminal operations at CSXT, sampling and testing of coal shipped on the CSSC ROTTERDAM is not helpful or relevant to this incident.

*See* Exhibit 2, Para. 9.

While the foregoing discussion has been one focused on the potential "relevance" of the different categories of coal claimed by Olam to be relevant, on the issue of exigency, John Allum states very clearly as follows:

> In my professional opinion, and in response to the comments contained in the Declaration of Jack Grinwis at Paragraph 8, as we are now forty-five (45) days removed from the August 18, 2025 voyage and explosion in the Port of Baltimore, the coal on the Vessel is no longer representative of the methane levels of the coal that existed as of August 18, 2025. Given the spare SGS samples that are available, there is no basis for immediate sampling of the testing and sampling of the coal onboard the Vessel.  ***In other words, there is no exigency requiring immediate sampling of the cargo.***

*See* Exhibit 2, Para. 10 (emphasis added).

In summary, the SGS samples taken during the loading operations of the Vessel are the "best" samples for purposes of determining the conditions and characteristics of the coal as of the time of loading on the Vessel, but even they may no longer reflect the condition of the cargo at the time of loading – especially in relation to methane – given that the incident occurred on August 18, 2025, more than forty-five (45) days ago.  But, regardless of whether they are still representative or not of the conditions and characteristics at the time of loading of the Vessel, there is no exigency requiring the immediate sampling of any of the coal cargoes.

### C. The Petition's Procedural Deficiencies Require Dismissal

Javelin incorporates herein by reference, as if fully stated herein, the arguments made by CSXT in Section II.2. of its Memorandum in Opposition regarding that fact that Olam's Rule 27 Petition was filed in an incorrect District as none of the Respondents/Defendants reside in the

District of Maryland,[1] and that the matter is not cognizable in a United States court, and that, for those two reasons, Olam's Petition must be denied.

### D. Several of the Arguments Made by Olam were Directed at Vessel Owners Even Though Olam Readily Admitted that Olam Cannot Pursue Rule 27 Remedies against Vessel Owners

In its Rule 27 Petition, Olam arguably seeks remedies, responses, and/or evidence from the Vessel Owners, despite the fact that it readily admits that "Olam cannot leverage Rule 27 against Vessel Owners. It must focus – for now – on the coal." (*See* Olam Memorandum, pg. 11). Olam directs arguments against Vessel Owners in several different sections of its Rule 27 Petition and related Memorandum in Support, most notably, as to the "Shipboard Coal Samples and Off-Loading Plan" (*Id.* at 8-9), "Time is of the Essence" (*Id*. at 10-11), "Coast Guard Port State Control Report" (*Id.* at 11), and "Ship Inspection" (*Id.*).

As many of these topics are being addressed in the Rule 27 Petition filed herein by Mercuria, Javelin, and Ultratech against the Vessel Owners in the consolidated proceeding found at 1:25-cv-03207-MJM, Javelin would respectfully request that Olam's requests for remedies, to the extent that they formally rise to that level in the context of this proceeding, by denied by this Court as being beyond the bounds of and beyond the intent of Rule 27 as it pertains to Olam.

---

[1] Counsel for Javelin finds it interesting to say the least that Olam, in its Memorandum in Support under the section of the Background Facts entitled "The Parties," seems to insinuate that because "Javelin is represented in this matter by legal counsel – Tydings & Rosenberg, LLP – that maintains an office in Baltimore" that this would somehow satisfy the Rule 27 requirements that a "Defendant" reside in the District. Olam made a similar type statement as to Ultratech when it stated at page 4 that "Ultratech appointed a local marine surveyor – International Cargo Surveyors, Inc., which maintains an office location, and resident agent, in Baltimore, MD – to represent its interest. Undersigned counsel is not aware of any applicable case law that would hold that the location of one's counsel or one's marine surveyor would have any bearing on the Rule 27 analysis about where the "Defendant" resides.

## CONCLUSION

For the reasons above, the Court should deny Olam's Rule 27 Petition in full, or at least as to Javelin.

                                                         __/s/ Alexander M. Giles__
                                                         Alexander M. Giles, Federal Bar No. 25474
                                                         Tydings & Rosenberg LLP
                                                         One East Pratt Street, Suite 901
                                                         Baltimore, Maryland 21201
                                                         Phone: (410) 752-9747
                                                         agiles@tydings.com

                                                         *Attorneys for Respondent,*
                                                         *Javelin Commodities*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of October 2025, the foregoing Memorandum in Opposition was served via ECF on all counsel of record.

                                                         __/s/ Alexander M. Giles__
                                                         Alexander M. Giles