IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| In Re: Petition of Olam Maritime Freight, PTE. LTD. | * | Civil Action No.: |
| | * | 1:25-cv-03195-MJM |
| Petitioner, | | |
| | * | IN ADMIRALTY, Rule 9(h) |
| For Order Authorizing Discovery Pursuant to Fed. R. Civ. P. 27. | * | |

## OLAM'S REPLY SUPPORTING ITS EMERGENCY VERIFIED PETITION FOR AN ORDER TO PRESERVE TESTIMONY AND EVIDENCE PURSUANT TO FED. R. CIV. P. 27

Olam's Fed. R. Civ. P. 27 petition is appropriately before this Court. This Court should now grant it. Olam replies to Respondents Javelin (Dkt. 17), and CSXT (Dkt. 14), and W-SAPPHIRE's owner (herein "Vessel Owner")(Dkt. 13). [1]

Javelin's and CSXT's and Owner's oppositions – and the expert declarations therein - confirm that there is no dispute: the physical and chemical properties of coal change over time. As detailed in the declaration of Dr. John Atherton, **Exhibit 1 herein**, sampling and testing of the coal onboard W-SAPPHIRE (along with the other ROTTERDAM coal samples) will identify the components of the released gas, and help determine the cause of the explosion on August 18, 2025. Sampling and/or testing must occur now to avoid any further (if any previous) changes to the coal.

CSXT does not dispute that the coal stockpile from which it loaded the W-SAPPHIRE was not preserved after the explosion. Rather, it seeks to shift the blame to Javelin. (Dkt. 14 at 4)("CSXT cannot unilaterally impound an entire coal pile which is contracted for transport or

---

[1]    Significantly, UltraTech – **owner** of the coal cargo that Olam petitions to sample and test - does not oppose Olam's petition.

refuse to load ships that are scheduled for delivery upon demand"). There is a need to perpetuate evidence and testimony controlled by CSXT and/or Javelin because of their past failure to preserve other relevant evidence (*i.e.* the coal stockpile).

### Recent Developments

#### *Owner Did Not Disclose Coast Guard Order to Court*

The U.S. Coast Guard issued a Captain of the Port Order ("COTP Order"), dated September 25, 2025, to the W-SAPPHIRE's master. **Exhibit 2 herein.** Vessel Owner, however, failed to disclose the COTP Order at the show-cause hearing held the following afternoon.[2]

Relevant to that hearing, the COTP Order directed Master to "[i]mplement and execute your Cargo Offload and Lightering Plan within the projected timeframe outlined in [its] plan," and that failure to do so exposed Master/Vessel Owner to a civil penalty up to $117,608/day.[3] Upon information and belief, the COTP Order remains in effect.[4]

---

[2]    Vessel Owner's Athens-based counsel disclosed Exhibit 2 to Olam – and others – via an email received at 4:58 p.m. on Saturday September 27, 2025. In the email, Vessel Owner's Athens-based counsel represented that, even though dated September 25, 2025, "Owners received it in the early hours of Friday, September 26, 2025." Nevertheless, before the show cause hearing.

[3]    The Cargo Offload and Lightering Plan provided an estimated timeline of 3-5 days for "Mobilization of equipment and personnel," and 10-14 days for "Cargo offload operations." **Exhibit 3.**

[4]    The parties agreed during a virtual team meeting on October 1, 2025 to consider transshipment of the cargo direct to another vessel (*i.e.* ship to ship). Based on Owner's representations, Olam understood Owners to have submitted a Transshipment Plan – prepared by Owner and/or its Qualified Individual - to the Coast Guard on or about October 8, 2025. The Transshipment Plan – as provided to Olam by Owner - does not contemplate sampling of the coal cargo before – or after – transshipment operations. Vessel Owner met with Coast Guard on October 9, 2025. On October 10, 2025, Vessel Owner reported that the US Coast Guard "will require confirmation of who will be the lead charterer of the M/V GERTRUDE OLDENDORFF prior to the Transshipment Plan submission, review or approval by their office." The next Coast Guard/Owner meeting is set for October 16, 2025.

The COTP Order also notes that the "damage and vessel condition present a hazardous condition to the port, waterway, and environment," thereby also giving rise to potential government and/or environmental penalties and/or litigation in this matter. This further supports Olam's contention in its petition that it expects to be a party to an action cognizable in a U.S. court. *See Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 484–85 (4th Cir. 1999)("A petitioner does not have to demonstrate a cognizable action with absolute certainty.")(citation omitted).

### *Transshipment Plan*

Vessel Owner's proposed Transshipment Plan involves the use of a second vessel ("OLDENDORFF vessel"). The OLDENDORFF vessel has four shipboard cranes with coal grabs that would lift coal from W-SAPPHIRE's holds. Cargo sampling is possible both before – and during – this process.

### *Coast Guard FOIA Response*

On October 6, 2025, Olam's counsel received a final response from the U.S. Coast Guard related to a Freedom of Information Act ("FOIA") request for the Marine Information for Safety and Law Enforcement (MISLE) Activity report related to the explosion onboard the W-SAPPHIRE. **Exhibit 4.** The Coast Guard denied this request in full citing FOIA Exemption 7(a) and determining that disclosure of the records "could reasonably be expected to interfere with law enforcement proceedings and final agency actions related to those proceedings." (emphasis added).[5] This, too, supports Olam's contention that U.S. litigation – including actions related to potential criminal or civil liability – and contribution for such - is cognizable.

---

[5]    Olam's counsel submitted an appeal to this determination.

*W-SAPPHIRE SGS Samples Are Being Tested*

Olam's request to test the SGS samples (from W-SAPPHIRE's loading) is now moot. These samples are currently undergoing testing at DEKRA laboratory, pursuant to a joint-testing protocol.

Two coal samples/potential samples remain in dispute: (1) SGS samples taken during the loading of the CSSC ROTTERDAM (again the "ROTTERDAM samples"); and (2) samples from the W-SAPPHIRE cargo holds both before, and during, the coal's discharge (again, "W-SAPPHIRE coal").

## Jurisdiction and Venue Are Proper

A Rule 27 petition may be filed in the in the district where "**any** expected adverse party resides." Fed. R. Civ. P. 27 (emphasis added). There is, therefore, no requirement that all of the adverse parties reside in the District. "Federal Rule 27(a)(1) has a very liberal jurisdictional provision for a proceeding to perpetuate testimony." *In re Reed,* No. 4:16-MC-1964, 2016 WL 5660421, at *4 (S.D. Tex. Sept. 29, 2016).

A defendant entity generally resides in any judicial district in which such defendant is subject to the court's personal jurisdiction. 28 U.S.C. § 1391. A foreign corporation may be sued in any judicial district. 28 U.S.C. § 1391(c)(3).

## Respondent CSXT Resides in the District

CSXT resides in this District because its principal place of business is in Baltimore, and it conducts continuous and substantial business in this District that directly gives rise to this petition.

CSXT's opposition does not contest – as Olam details in its petition – that it is registered to do business in Maryland, with a principal office (place of business) in Baltimore, MD and

with a resident agent in Lutherville-Timonium, Maryland.  It operates a Baltimore facility that receives and loads coal onto vessels for export – including the W-SAPPHIRE and CSSC ROTTERDAM.  CSXT's Baltimore facility – at-issue in this petition - operates as a "[c]oal storage and transfer facility" under an Operating Permit (510-2263 dated July 29, 2025) issued to it by the Maryland Department of the Environment.[6]

CSXT cites *In re Marshall*, 2015 WL 849302, at *2 (D. Del. Feb. 25, 2015) and *In re Reed*, No. 4:16-MC-1964, 2016 WL 5660421, at *4 (S.D. Tex. Sept. 29, 2016) to support its contention that a "corporation resides in the district where it is incorporated and where it is headquartered." (Dkt. 14 at 5).  While true, neither case holds that is the only way a party may reside in a district under Rule 27.

Rather, in *In re Marshall*, the Court permitted transfer of a Rule 27 petition from Delaware to New York, despite four of the adverse parties being incorporated in Delaware.  The Court specifically noted, "incorporation in Delaware is not dispositive, *see Link_A_Media Devices Corp.,* 662 F.3d 1221, 1224 (Fed. Cir. 2011), and here all four Delaware corporations have their principal place of business in New York." *In re Marshall* at *2.  The Court also indicated the location "where the relevant events occurred" (New York) weighed strongly in favor of transfer.  *Id* at *3.

CSXT is like the Delaware defendants in *In re Marshall* – though incorporated in Virgina, its principal place of business is in Maryland, the coal at issue was loaded from its Maryland facility, and the explosion happened in Maryland.  Maryland is an appropriate District

---

[6] Available at:
https://mde.maryland.gov/programs/permits/AirManagementPermits/Documents/CSX/CSX_PTOcoverand%20conditions_29July2025.pdf ; last visited October 8, 2025.

for Olam's Rule 27 petition. CSXT offers no reason why Virginia – or any other District- would be better situated to hear the petition against CSXT.

*In re Reed* also offers little help to CSXT.  As the *In re Reed* Court noted:

> Rule 27(a) simply requires that the subsequent expected lawsuit be filed in a court that has subject matter and personal jurisdiction over the defendants. As counsel for Reed stated at the hearing, that requirement may make it necessary for petitioner to file her expected lawsuit in a number of courts that have jurisdiction over the various potential defendants, **but the issue of perpetuation of Reed's testimony may be resolved here, where two named interested parties reside.**

*In re Reed* at *4 (emphasis added).

Regardless, here, because this Court has personal jurisdiction over CSXT, it also resides in the District for Rule 27 purposes.  Rule 27 issues may be resolved by this Court, not only against CSXT, but the other adverse parties as well.  And even if this Court were to find CSXT (and all other adverse parties) does not reside in the District- which it shouldn't – the remedy is transfer, not denial or dismissal of Olam's petition.

### Respondent Javelin Resides in the District

Javelin's opposition does not contest that it is a foreign corporation.  Javelin is subject to this Court's personal jurisdiction because of its continuous and substantial contacts in this District.  It is the voyage charterer of W-SAPPHIRE – a vessel that continues to be in this District. Javelin was the shipper and previous owner of coal transported to and loaded by CSXT onto the W-SAPPHIRE in Baltimore.  It is also the shipper of the coal loaded onto the CSSC ROTTERDAM.  The events at issue giving rise to this petition occurred in Maryland.  Javelin is therefore deemed to reside in this District for Rule 27 purposes.  Javelin offers no explanation as to where it contends Olam could – or should – have filed its petition.  Javelin seems to believe that, as a foreign corporation, it is exempt from a Rule 27 petition. This cannot be the case.

Further, Javelin has voluntarily availed itself of this Court's authority and jurisdiction by filing the closely related matter of *In re Mercuria Shipping SARL, et. al.,* 25-cv-02307.

**<u>Vessel Owner is not an Adverse Party.  This Court Should Disregard Its Briefing.</u>**

W-SAPPHIRE's owner is not an adverse party to Olam's petition.  Olam does not seek to perpetuate any evidence from Vessel Owner.  It is unclear why Vessel Owner believes it has standing to file an opposition against Olam's petition – and cites none in its papers. (Dkt. 13). At best – it amounts to an amicus brief filed without authority and in violation of L.R. 105.12.  The Court should disregard it.

To the extent that the coal, shipped by Respondent Javelin, and purchased by UltraTech, is on W-SAPPHIRE, Fed. R. Civ. P 34 permits Olam to access this evidence onboard.  *Martin v. Reynolds Metals Corp*., 297 F.2d 49, 55–56 (9th Cir. 1961); *see also Petition of Thomas,* 155 F.R.D. 124, 126 (D. Md. 1994). This does not equate to Olam seeking relief against Vessel Owner.

**<u>In the Alternative – Vessel Owner – Though Their Vessel – Resides in the District</u>**

Vessel Owner asserts Olam cannot claim against it under the Federal Rules of Civil Procedure.  (Dkt. 13-1 at 2).  Again, Olam doesn't – and was clear in its moving papers that it didn't – claim against Vessel Owner (Dkt 1-1 at 11)("Olam cannot leverage Rule 27 against Vessel Owners"). Vessel Owner, however, voluntary appeared (without any limitation) and filed an opposition to Olam's Rule 27 petition against other adverse parties.

To the extent Olam's petition seeks relief against Vessel Owner – which it doesn't - Vessel Owner's unrestricted appearance amounts to consent of this Court's authority to hear this petition and be subject to its authority under Rule 27 - notwithstanding Olam's London arbitration provision with Vessel Owner.  *Phibro Commodities v. M.V. Rizcun Trader*, 1997 WL

583206, at *1 (E.D. Pa. Mar. 26, 1997)("even if Latif were correct that this is part of the underlying dispute which should be heard by the courts of England, I, nonetheless, believe that exceptional circumstances exist to warrant the preservation of testimony and evidence for the benefit of whatever fora are the loci of litigation in this matter at a later date.")

Vessel Owner is a foreign company. Its Vessel remains in this District, subject to a COTP order restricting its movement, and may be subject to arrest by Olam under the Supplemental Rules of Admiralty for security for any London arbitration claims (and by others – such as Ultratech for direct claims). As such, Vessel Owner resides in this District for the purposes of Rule 27.

### Olam- and Others- Have – for Weeks – Immediately After the Incident – Demanded Sampling, Before Requesting this Court to Order It

During the September 26, 2025, show cause hearing, the Court seemingly faulted Olam for not seeking Court relief sooner. (Dkt. 17-1 at 10, page 31 line 19-22) ("Especially given the fact that now this petition's being filed six weeks after the event. If it mattered that much, I would have expected the petition had been filed a couple of days after the explosion.").

Olam, however, attempted to first obtain the coal samples by cooperation amongst the parties without having to seek court intervention. Olam turned to this Court only after Olam's repeated attempts for cooperation proved futile.

The facts and circumstances of the incident also provide additional context to the timing of Olam's petition. In the immediate aftermath of the explosion, Vessel Owner – citing safety concerns – did not allow anyone to access the Vessel. Olam – and others - therefore focused on obtaining samples from the coal pile at CSXT (which CSXT and Javelin failed to preserve as detailed further below).

During those discussions, Vessel Owner's counsel stated; "We were copied on several messages yesterday regarding proposed sampling and testing of stockpile coal said to remain at CSX . . . **The only 'sample' of the coal as loaded is the cargo remaining stowed aboard the vessel** . . ."**Exhibit 5.** (emphasis added).

As such, from the outset, Vessel Owner recognized – and admitted to - the relevance of the coal onboard the W-SAPPHIRE.  Vessel Owner appeared amenable to sampling the coal on the Vessel and Olam – and others - acted based on that representation.

On August 27, 2025, Mercuria's counsel circulated a proposed protocol – prepared by its expert – to Vessel Owner and others - to spot sample coal onboard W-SAPPHIRE while it remained at anchorage. **Exhibit 6.**

On September 5, 2025, Olam sent correspondence to Vessel Owner's counsel requesting to sample and test the cargo remaining onboard the Vessel in accordance with the joint sampling and testing plan agreed to amongst the parties.  Olam asked Vessel Owner's counsel to advise as to when the Vessel will permit sampling of cargo from the Vessel holds and requested a response by September 18, 2025.

After September 18, 2025 - date passed without a response - Olam began considering Court intervention.  Olam, shortly thereafter, moved for such relief on September 26, 2025 after receipt of Vessel Owner's Offloading Plan and when discharge of the coal – without sampling – appeared imminent.

## Parties Agree Time is of the Essence

There is no dispute - the physical and chemical properties of coal change over time.  *See* (Dkt. 13-1) Jonas Aff. at ¶ 5;  (Dkt.17-2) Allum Aff. at ¶ 7; Exhibit 1, Atherton Aff. at ¶3. Thus, to avoid any future changes to the coal, the coal must be tested as soon as possible.  Permitting

Olam's adverse parties to further delay testing of the coal risks spoliation of this evidence. The

other potential outcome - never testing the coal – is adverse to the interests of justice by

depriving the ultimate fact finder of relevant evidence as to the cause of the explosion. Testing of

the coal (both onboard the SAPPHIRE and the ROTTERDAM Sample) is relevant.

> As Dr. Atherton explains:
>
> Analysis of gas from the coal will permit the identification of the various components of
> the gas. It is likely the main component will be methane, but there may also be – for
> example - higher hydrocarbons, hydrogen, carbon monoxide, and hydrogen sulphide.
> These additional components, depending on the concentration, may affect the properties
> of the gas, including the upper and lower flammable limits of the gas, the ignition energy
> and autoignition temperature. Knowledge of these properties is important in determining
> why the explosion occurred.

Atherton Aff. at 5.

**Vessel Owner's Expert's Conclusions are Premature**

Dr. Jonas summarily concludes that "[t]he August 18 explosion in #2 hold of the W-

SAPPHIRE was due to excessive and dangerous levels of methane within #2 hold" and that

because of this conclusion any testing results would be "meaningless and misleading." *See* Jonas

Aff. at ¶ 3, 7. Dr. Jonas's conclusions, however, are premature. Atherton Aff. at ¶ 6.

Dr. Jonas concludes – without any testing on the gas emissions from the coal – that the

coal only releases methane. Again, as detailed above and explained in Dr. Atherton's declaration,

the coal gas could contain components – other than methane – which could impact the upper and

lower flammable limits of the gas, the ignition energy and autoignition temperature. Testing is

needed. Even if Dr. Jonas is correct– that only methane is released (which cannot be confirmed

without gas analysis of the coal) – further testing would only seemingly support his conclusions

– not cause confusion or mislead. Regardless, a premature conclusion is not a valid basis to not

- 10 -

gather additional available evidence that will be lost (or its relevance arguably reduced) if not timely sampled and tested.

In short, Vessel Owner's expert creates a narrative, based on a premature conclusion, to support Vessel Owners position that only the coal is to blame for the explosion. Vessel Owner's opposition to coal testing – when it is not even an adverse party to the petition - is an attempt to limit access to evidence that might (or might not) refute its premature conclusion as to causation – and the only conclusion from which it escapes liability. That should not be permitted by this Court in the interest of justice. The point here, and to Olam's overall petition, is that this critical evidence from the coal – whatever it may reveal about the coal and ultimate causation - must be preserved before it is no longer available. The parties can dispute the weight of this evidence before the ultimate finder of fact.

Again, there is evidence available that suggests that the fault may rest with the Vessel. As detailed in its petition, a United States Coast Guard Port State Control Report of Inspection documents that the Vessel's gas detection equipment was inoperable and that its Officer noted "ventilation hatch covers closed and secured by mechanical means on the no.2. cargo hold hatch."

Regardless, now is not the time for premature speculation or hasty conclusions as to causation – it is the time to preserve and gather evidence from which experts can make a well-reasoned and informed opinion, and from which the ultimate fact finder can decide.

Ultimately, Dr. Jonas made his determination without the benefit of a complete investigation – and thus relevant and material evidence - typical in a marine casualty investigation. There has yet to be a full inspection the W-SAPPHIRE, and particularly hold No. 2, (including once all cargo is removed from the hold) by any party. Evidence learned from this

inspection must be gathered, and considered, before appropriately opining on the cause of the explosion. And it is unknown if relevant witnesses – including crew members – were interviewed and considered by Dr. Jonas. Dr. Jonas's opinion, therefore, should not be given significant weight – if any – by this Court.

## Cargo Onboard W-SAPPHIRE is Relevant

Both Dr. Atherton and Dr. Allum conclude there is relevant information as to the cause of the explosion to be learned from individual samples of each cargo hold onboard W-SAPPHIRE. *See* Allum Aff. at ¶ 8.; Atherton Aff. at ¶ 4. While Vessel Owner's expert now suggests that testing is meaningless - that is at odds with Vessel Owner's initial position which contended that "[t]he only 'sample' of the coal as loaded is the cargo remaining stowed aboard the vessel." This coal must be sampled and tested.

## Owner's Expert Overstates Any Impact of the Loading Process

Dr. Jonas's affidavit attempts to attach significance to how CSXT loaded coal onto the W-SAPPHIRE and reporting – without reference – a drop of "several meters." Jonas Aff. at 10. Initially, this description appears at odds with CSXT's Operating Permit which details a careful process and utilization of telescoping chutes to minimize "the drop height of the material," and the impacts of loading.

**3.6 SHIP/BARGE LOADOUT**

CSXT loads dry material into ships and barges through a barge/shiploader, equipped with a vertical telescoping chute to minimize potential fugitive dust emissions. A telescoping chute minimizes the drop height of the material and the effect of wind within the hold of the ship. The ship loadout operator performs continual visual observations for potential emissions and manually activates water spray controls upstream of the ship loadout process to minimize fugitive dust emissions, as necessary.

The use of a telescoping chute during ship/barge loadout and water sprays, as necessary, during ship loadout represent reasonable precautions for minimizing fugitive dust emissions from ship/barge loadout at Curtis Bay Piers.

- 12 -

Available at:
https://mde.maryland.gov/programs/permits/AirManagementPermits/Documents/CSX/CSX_PTOcoverand%20conditions_29July2025.pdf ; last visited October 8, 2025.

More importantly, however, Olam expert Jack Grinwis explains in his declaration –

**Exhibit 7 herein –** that, because the coal at-issue here likely originated from a longwall mine, it would contain smaller coal particles than surface or conventionally mined coal sizing leading to less fracturing (and less methane release) on impact than Dr. Jonas suggests to this Court. Dr. Jonas's assertions in his declaration on methane release during loading further supports the need for investigation into the source of the coal and testing of the coal samples to test his assertions. It also further supports the need to obtain from CSXT personnel details on the loading – including now - the drop height of the cargo and the visual observations of the ship load out operator.

### CSXT and/or Javelin Have Already Failed to Preserve Evidence

CSXT incorrectly contends that Olam fails to explain why any of this testimony or evidence – from CSXT - is in danger of being lost.  (Dkt. 14 at 2). This is incorrect.  But – to be clear – Javelin and/or CSXT failed to preserve "the coal pile," from which it loaded W-SAPPHIRE.  Because Javelin and CSXT already failed to preserve relevant evidence, the Court must act to ensure additional evidence is not lost.  By way of further explanation:

CSXT papers provide a general description of how it maintains a coal stockpile that is purportedly "continuously replenished with coal from railcars to build up the quantity of coal necessary to load the next ship." (Dkt. 14 at 4).  CSXT's opposition contains no affidavit or declaration supporting its assertions.   CSXT also provides no details in its papers as to if any coal was added to the subject stockpile between loading the W-SAPPHIRE and CSSC ROTTERDAM – and if so - when.  The timeline matters.   There is no dispute that the explosion

occurred onboard W-SAPPHIRE on August 18, 2025 within about an hour and a half – or less - of sailing, at about 6:30 pm.

It is hard to fathom that CSXT and/or Javelin– despite knowing that a departing ship suffered an explosion in its cargo hold – would then continue to add to the at-issue coal pile – and then load another ship from that same coal pile (which as Vessel Owner contends is dangerous and the sole cause of the explosion) – without – at least – testing the coal in the subject pile. Further, as detailed in its petition (Dkt. 1-1 at 7-8), the CSSC ROTTERDAM did not arrive at the CSXT facility until August 22, 2023 – after Olam had made its request for testing of the coal stockpile known to both Javelin and CSXT.  So again, when, and why, did CSXT and/or Javelin add to a coal stockpile? And why did Javelin and/or CSXT load coal from the at-issue pile onto another ship leaving the United States – when it had received a preservation notice and knew the Vessel Owner was claiming the coal to be unusually dangerous?

CSXT's contentions are also at odds with Javelin's representation to Olam and others –

**Exhibit 8 herein -** that:

> After the completion of the loading process with regard to the W SAPPHIRE, the CSXT terminal started loading the next vessel, which was the CSSC Rotterdam, and during that loading process of the CSSC Rotterdam, they completely cleared out the cargo stockpile that had been residing on the CSXT terminal after the departure of the W SAPPHIRE.

Javelin's email does not mention any coal being added to the subject coal pile, and it indicated the stockpile had been "completely cleared out," which is inconsistent with the continuous stockpile described by CSXT in its opposition.   Finally, because the coal stockpile was improperly loaded onto the CSSC ROTTERDAM, the ROTTERDAM Samples became relevant to the W-SAPPHIRE case as they are the only available evidence of the coal that had remained in the stockpile that is accessible to the parties and this Court.

- 14 -

## CONCLUSION

Delays in sampling and testing create a risk of irreparable loss of critical physical evidence. This Court should immediately order testing and sampling of the coal onboard the W-SAPPHIRE before – and during - its offload to ensure such evidence is adequately preserved without the threat of contamination or commingling.

This Court should also enter an order requiring Javelin to produce the already-preserved coal samples taken during the loading of the CSSC ROTTERDAM for testing, consistent with the testing of the SGS samples from the W-SAPPHIRE.

Javelin's and/or CSXT's failure to preserve the coal pile for potential testing warrant court intervention to preserve testimony on: (1) whether the coal was blended; and (2) the loading sequence – and ventilation - of the coal on the W-SAPPHIRE and CSSC ROTTERDAM.

Finally, CSXT should be ordered to produced relevant evidence – especially any videos of the arrival, loading, and departure of the W-SAPPHIRE and CSSC ROTTERDAM, and gas monitoring information from its CSXT facility in August 2025.

Dated: October 10, 2025.

/s/ J. Stephen Simms
J. Stephen Simms (04269)
Gary C Murphy (31057)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
Telephone: 410-783-5795
jssimms@simmsshowers.com
gcmurphy@simmsshowers.com

Counsel to Olam Maritime Freight PTE. LTD.

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this October 10, 2025, I caused the foregoing Reply to be filed through this Court's CM/ECF system for service on all record counsel.

<u>/s/ J. Stephen Simms</u>