**IN THE UNITED STATES DISTRICT COURT**
**<u>FOR THE DISTRICT OF MARYLAND</u>**

|  |  |  |
|---|---|---|
| | * | |
| IN RE PETITION OF OLAM MARITIME | * | |
| FREIGHT, PTE. LTD., | * | **Civ. No. MJM-25-3195** |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| For Order Authorizing Discovery | * | |
| Pursuant to Fed. R. Civ. P. 27 | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | * | |
| IN RE MERCURIA SHIPPING SARL, | * | |
| JAVELIN GLOBAL COMMODITIES | * | |
| (UK), AND ULTRATECH CEMENT | * | |
| LIMITED, | * | **Civ. No. MJM-25-3207** |
| | * | |
| Petitioners, | * | |
| | * | |
| For Order Authorizing Discovery | * | |
| Pursuant to Fed. R. Civ. P. 27. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

Currently pending are two petitions filed pursuant to Rule 27(a) of the Federal Rules of Civil Procedure seeking perpetuation of testimony and evidence relevant to an explosion that occurred in a cargo hold of the motor vessel W-SAPPHIRE on August 18, 2025, causing damages to the vessel and cargo. Following show cause hearings, the Court conducted an evidentiary hearing and heard oral argument on both petitions on October 20, 2025. For the reasons explained herein, the petition filed by Olam Maritime Freight PTE LTD will be granted in part and denied in part, and the petition filed by Mercuria Shipping Sarl, Javelin Global Commodities (UK), and Ultratech Cement Limited will be granted with restrictions.

1

## I.    BACKGROUND

### A.  Factual Background

The W-SAPPHIRE (the "Vessel") is a 751-foot, Liberian flagged, bulk carrier owned by Linville LP ("Linville"), a company with its address in Monrovia, Liberia, and managed by W Marine, a Greece company (collectively, "Vessel Owners"). *See* Civ. No. 25-3195, ECF No. 1-1 (Olam Mem.) at 3. At all relevant times, the Vessel operated under a series of back-to-back charterparties[1] by, in order, Olam Maritime Freight PTE LTD ("Olam"), a Singapore company; Mercuria Shipping Sarl ("Mercuria"), a limited liability company that maintains its principal office location in Switzerland; and Javelin Global Commodities (UK) ("Javelin"), a company based in the United Kingdom. *Id.* at 3–4. Each of these charterparties is governed by English law, and all claims for relief by each charterer against an adjacent charterer up and down the chain are subject to arbitration in London. Olam Mem. at 2, 14; Civ. No. 25-3195, ECF No. 1-5 (Mercuria Mem.) at 3. Claims between Olam and Vessel Owners are also subject to arbitration. Olam Mem. at 2; Civ. No. 25-3195, ECF No. 13-1 (Linville Opp'n) at 2. At the time of the Incident, Olam was the time charterer of the Vessel, Mercuria was the trip time charterer, and Javelin was the voyage charterer and shipper of the coal cargo loaded and stored on the Vessel.[2]

On August 16, 2025, the Vessel arrived at the Port of Baltimore for the purpose of loading coal from CSX Transportation, Inc.'s ("CSXT") Curtis Bay coal pier and terminal facility. Olam

---

[1] A charterparty is "[a] contract by which a ship, or a principal part of it, is leased by the owner, esp. to a merchant for the conveyance of goods on a predetermined voyage to one or more ports or for a specified period of time; a special contract between the shipowner and charterer, esp. for the carriage of goods by sea." *Charterparty*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[2] A charterer is "[a] person or company that contracts (by charterparty) with a shipowner for the transportation of passengers or cargo for a specified voyage or period of time." *Charterer*, BLACK'S LAW DICTIONARY (12th ed. 2024). The shipowner commonly supplies the vessel's crew, but the charterer selects the ports, route and vessel speed. *See* 80 C.J.S. *Shipping* § 93 (2025). A trip time charter is a lease of a vessel for a specific journey or for a predetermined duration. *Id.* A voyage charter is the hiring of a vessel and crew for a voyage between a load port and a discharge port. *Id.* § 94.

Mem. at 5; Civ. No. 25-3195, ECF No. 17 (Javelin Opp'n) at 2. Once the coal loaded onto the Vessel, title to the cargo transferred from Javelin to Ultratech Cement Limited ("Ultratech"), an India cement company. *See* Olam Mem. at 4; Oct. 20, 2025, Hearing Tr. ("Hearing Tr.") at 26:22–27:1.

During the loading process, samples of the coal being loaded onto the Vessel were taken and preserved in three bins, which were later provided to SGS North America Inc., an inspection and testing company, on August 19, 2025 ("SGS samples"). Olam Mem. at 5–6. The SGS samples were later inspected in accordance with testing protocol jointly agreed upon by the interested parties.

| Party | Role |
|---|---|
| Linville | Owner of the W-SAPPHIRE |
| W Marine | Manager of the Vessel |
| Olam | Head charterer (time charterer) of W-SAPPHIRE |
| Mercuria | Sub-charterer (trip time charterer) of W-SAPPHIRE |
| Javelin | Sub-sub charterer (voyage charterer) of W-SAPPHIRE and shipper of the coal cargo |
| Ultratech | Title holder to the coal cargo aboard W-SAPPHIRE |
| CSXT | Owner and operator of the terminal from which coal was loaded onto the W-SAPPHIRE |

On August 18, 2025, the Vessel departed from CSXT's facility and, shortly thereafter, suffered an explosion in its cargo hold number 2, where a portion of the coal cargo was stored (the "Incident"). The casualty resulted in damage to the Vessel and cargo, disruption to port operations, safety and environmental hazards, and temporary closure of the port. *See* Civ. No. 25-3207, ECF No. 1-3 (Lennon Decl.) at 1. Since August 18, the Vessel has remained in the District of Maryland, and the crew remains on board, as does the cargo.

After the Incident, the United States Coast Guard and the National Transportation Safety Board initiated independent investigations into its causes. Mercuria Mem. at 2. These investigations remain ongoing, and the Vessel is detained pending investigation. *Id*.; Olam Mem. at 11. However, the report from an inspection conducted by the Coast Guard on August 22 reflects "objective evidence of a serious failure of the implementation of the [International Safety Management] code," including an operational failure of gas detection equipment. Civ. No. 25-3195, ECF No. 23-1 at 3. The Coast Guard directed Vessel Owners to execute a plan to offload the cargo and submit a detailed plan for repair of the Vessel. Civ. No. 25-3195, ECF No. 21-2 (Captain of the Port Maryland-NCR Order 29-25 Update 2). Vessel Owners have made arrangements to offload the coal from the Vessel, which are scheduled to begin sometime near the end of November. Hearing Tr. at 78. Once the coal is offloaded and damage to the Vessel can better be assessed, the "current plan" is to complete temporary repairs in the United States before the Vessel will go elsewhere for permanent repairs. *Id.*

Since the Incident, Olam, Mercuria, Javelin, and Ultratech have requested that Vessel Owners produce certain "core vessel documents, permit an independent marine inspection and survey of the Vessel and cargo, and make available key crew members (including the master, chief officer, chief engineer, and electrical/ventilation personnel) for "limited depositions concerning cargo loading, stowage, ventilation, gas detection, and related procedures." Mercuria Mem. at 3. Olam, Mercuria, Javelin, and Ultratech represent to the Court that such information is customarily made available shortly after a casualty like the Incident, but Vessel Owners have refused to produce the requested documents, permit an inspection, or permit depositions of the crew.

The loading of Javelin-owned coal onto the W-SAPPHIRE substantially depleted the coal stockpile at the CSXT facility used to load the Vessel on August 18, 2025. Thereafter, CSXT

transported additional Javelin-owned coal to the facility and dumped that coal onto the stockpile. On August 22, 2025, another vessel, the CSSC ROTTERDAM, arrived at CSXT's Curtis Bay facility, and Javelin and/or CSXT loaded Javelin-owned coal onto the CSSC ROTTERDAM from the same stockpile used to load the W-SAPPHIRE and cleared out the stockpile. The CSSC ROTTERDAM departed on or about August 25, 2025, enroute to India. As was done for the W-SAPPHIRE, samples were taken of the coal cargo loaded onto the CSSC ROTTERDAM and are presently being retained by SGS at Javelin's request.

### B.  Procedural History

On September 26, 2025, Olam filed an Emergency Verified Petition for Order to Preserve Testimony and Evidence Pursuant to Federal Rule of Civil Procedure 27(a). Civ. No. 25-3195, ECF No. 1 ("Olam Petition"). Specifically, Olam asked the Court to order: "(1) immediate sampling and testing of coal samples relevant to the explosion onboard the W-SAPPHIRE on August 18, 2025; (2) depositions and documentary evidence related to the loading of the W-SAPPHIRE and CSSC ROTTERDAM; and (3) gas monitoring information and video from the coal loading facility." *Id.* at 1. Olam argued that immediate court intervention was necessary because it believed Vessel Owners would begin offloading the cargo on the Vessel as soon as the next day, which risked loss of evidence for anticipated future litigation related to the Incident. *Id.*[3]

The Court held a show cause hearing the same day Olam filed its petition, which was attended by counsel for Olam, Linville, Mercuria, Javelin, Ultratech, and CSXT. Counsel for Linville represented to the Court that Vessel Owners would not, and practically could not, begin the process for offloading the coal cargo for at least a month. The Court determined that immediate

---

[3] Olam supported its petition with a memorandum of law and declarations from Jack Grinwis and Dr. John Atheron. *See* Civ. No. 25-3195, ECF Nos. 1-1, 1-2 & 1-3.

relief was not necessary, set a briefing schedule, and scheduled a hearing on the Olam Petition for October 20, 2025, pursuant to Rule 27(a)(2). Linville and CSXT each filed a response in opposition to the Olam Petition on October 3, followed by Javelin's response in opposition on October 4. Civ. No. 25-3195, ECF Nos. 13, 14 & 17.[4] Olam filed its reply on October 10. Civ. No. 25-3195, ECF No. 21.[5]

On September 26, 2025, Mercuria, Javelin, and Ultratech (collectively, "Mercuria Petitioners") filed their own Verified Petition for Order to Preserve Testimony and Evidence Pursuant to Rule 27. Civ. No. 25-3207, ECF No. 1 ("Mercuria Petition").[6] Their petition requested court authorization to: "a. Take the depositions upon oral examination of the Vessel's master, chief officer, chief engineer, and relevant ventilation/electrical personnel; b. Conduct a proper independent marine inspection of the Vessel; c. Obtain preservation and production of a targeted set of vessel documents, including cargo logs, stowage and ventilation plans and records, gas-monitoring data, SMS/ISM checklists, cargo safety data, and related operational records." *Id.* at 4–5. Mercuria Petitioners argued, in part, that the Vessel's crew members are foreign nationals who are expected to depart the United States imminently and that, once the crew members leave, they will be beyond the reach of compulsory process and their availability to testify cannot be guaranteed. *Id.* at 3–4.

---

[4] Linville supported its opposition with affidavits from physicist Dr. Martin Jonas, *see* Civ. No. 25-3195, ECF Nos. 13-2 & 22, and Javelin supported its opposition with a declaration from John Allum, a marine incident investigator, Civ. No. 25-3195, ECF No. 17-2.

[5] Olam attached several exhibits to its reply brief, including additional declarations from Dr. Atherton and Mr. Grinwis, U.S. Coast Guard documents, and email communications among counsel for the interested parties. *See* Civ. No. 25-3195, ECF Nos. 21-1 through 21-8.

[6] Mercuria Petitioners supported their petition with a memorandum of law and a declaration from Patrick Lennon, counsel to Mercuria. Civ. No. 25-3207, ECF Nos. 1-5 & 1-3.

The Court held a show cause hearing on the Mercuria Petition on October 8, set a briefing schedule, and scheduled a hearing to be conducted concurrently with the hearing on the Olam Petition on October 20. The Court also directed the parties to confer promptly regarding the presence and availability of the Vessel's crew members. Vessel Owners filed a response in opposition to the Mercuria Petition on October 13, to which Mercuria Petitioners replied on October 16. Civ. No. 25-3207, ECF Nos. 15 & 18.[7]

On October 20, the Court conducted the hearing for both the Olam Petition and the Mercuria Petition. At the hearing, the Court heard oral argument from each petitioner's and adverse party's counsel and testimony from Dr. John Atherton and John Allum, experts in fire and explosion investigation and analysis. Counsel represented that Vessel Owners agreed they would not repatriate the Vessel crew until this Court issues a ruling with respect to Mercuria Petitioners' request for depositions. On October 23, Vessel Owners filed a joint stipulation memorizing their agreement with Mercuria Petitioners. Civ. No. 25-3207, ECF No. 21 (Joint Stipulation). Specifically, the Joint Stipulation lists "certain identified crewmembers employed by and/or on behalf of the Vessel Owner" who "were on board the vessel and may possess material knowledge of the facts and circumstances surrounding the incident." *Id.* at 1, Ex. A. Vessel Owners agree to "take no steps … that would facilitate … or permit the repatriation, discharge, or removal of any Identified Crewmember from the United States prior to the Court's ruling on the Petitioners' pending Rule 27 application." *Id.* However, if the Vessel receives "permission from the United States Coast Guard to sail from this Court's jurisdiction and the Court has not yet issued an Order denying or granting the Petition," Vessel Owners will provide 10 days' notice and "will not remain

---

[7] Mercuria Petitioners attached to their reply a declaration from marine surveyor Stijn Vodde.

under any obligation to retain the Identified Crewmembers within this Court's jurisdiction[,]" absent any court order to the contrary. *Id.* at 2.

## II.    STANDARD OF REVIEW

Rule 27(a) of the Federal Rules of Civil Procedure authorizes pre-complaint perpetuation of testimony and evidence to "prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3). The Rule is not a substitute for discovery, however. *See Penn Mut. Life Ins. v. United States*, 68 F.3d 1371, 1376 (D.C. Cir. 1995). Rather, the Rule applies only in "that special category of cases where it is necessary to prevent testimony from being lost." *Application of Deiulemar Compagnia Di Navigazione S.p.A. v. M/V Allegra*, 198 F.3d 473, 484 (4th Cir. 1999) (quoting *Ash v. Cort*, 512 F.2d 909, 911 (3d Cir. 1975)). Because Rule 27(a)'s purpose is to aid the eventual adjudication of rights—not determine substantive rights now—it is designed to "afford a simple ancillary or auxiliary remedy to which the usual federal jurisdictional and venue requirements do not apply." *M/V Allegra*, 198 F.3d at 484 (quoting *Mosseller v. United States*, 158 F.2d 380, 382 (2d Cir. 1946)). "What circumstances show a possible failure or delay of justice sufficient to call for the issuance of a [Rule 27] order is . . . a matter for the sound discretion of the district court." *Mosseller*, 158 F.2d at 382.

A party seeking pre-suit perpetuation of testimony "may file a verified petition in the district court for the district where any expected adverse party resides." Fed. R. Civ. P. 27(a)(1). A Rule 27(a) petitioner must show:

> (A) that the petitioner expects to be a party to an action cognizable in a United States court but cannot presently bring it or cause it to be brought;
>
> (B) the subject matter of the expected action and the petitioner's interest;

(C) the facts that the petitioner wants to establish by the proposed testimony and the reasons to perpetuate it;

(D) the names or a description of the persons whom the petitioner expects to be adverse parties and their addresses, so far as known; and

(E) the name, address, and expected substance of the testimony of each deponent.

Fed. R. Civ. P. 27(a)(1).

The petitioner "does not have to demonstrate a cognizable action with absolute certainty." *M/V Allegra*, 198 F.3d at 484–85 (citing *Penn Mut. Life Ins. Co. v. United States*, 68 F.3d 1371, 1374 (D.C. Cir. 1995)). It need only demonstrate "a sufficient likelihood that the expected litigation will eventuate." *Id.* at 485 (quoting *De Wagenknecht v. Stinnes*, 250 F.2d 414, 417 (D.C. Cir. 1957)). Still, a petitioner must show that "federal jurisdiction would exist" in the contemplated future litigation for which the evidence is being perpetuated. *M/V Allegra*, 198 F.3d at 484 (quoting *Dresser Indus. v. United States*, 596 F.2d 1231, 1238 (5th Cir. 1979)). And "the testimony to be perpetuated must be relevant, not simply cumulative, and likely to provide material distinctly useful to a finder of fact." *M/V Allegra*, 198 F.3d at 486–87 (quoting *In re Bay Cnty. Middlegrounds LandfillSite*, 171 F.3d 1044, 1047 (6th Cir. 1999)).

By reference to Federal Rules 34 and 35, Rule 27(a) also permits limited pre-complaint preservation of evidence beyond deposition testimony, including inspection and production of documents and tangible things, provided the requirements of Rule 27(a) are met. *See* Fed. R. Civ. P. 27(a)(3) (permitting court to "issue orders like those authorized by Rules 34 and 35"); *M/V Allegra*, 198 F.3d at 478 n.5 ("Perpetuation of testimony includes inspection of documents and things."); *id.* at 484 (affirming district court's order granting Rule 27 petition and allowing petitioner to "inspect the vessel, observe repairs, and copy documents from the ship"); *Petition of*

9

*Thomas*, 155 F.R.D. 124, 126 (D. Md. 1994) (recognizing that Rule 27 allows "relevant evanescent evidence capable of preservation" to be preserved) (citing *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 55–56 (9th Cir. 1961)).

## III.    ANALYSIS

### A.  The Olam Petition

In its verified petition, Olam requests a Rule 27(a) order authorizing (1) sampling and testing of the coal cargo aboard both the W-SAPPHIRE and the CSSC ROTTERDAM; (2) depositions of Javelin and CSXT corporate representatives regarding whether the coal was blended and how the coal was loaded and ventilated aboard both vessels; (3) production by CSXT of relevant evidence, including video footage of the loading and departure of both vessels and any gas monitoring data from August 2025. Vessel Owners, Javelin, and CSXT all oppose the Olam Petition on various procedural and substantive grounds. Upon review of the parties' arguments and the evidentiary record, and for the reasons explained below, I find the requested sampling and testing of coal aboard the W-SAPPHIRE to be justified to avoid a failure of justice, but Olam fails to meet its burden with respect to its other Rule 27 requests. Accordingly, the Olam Petition shall be granted in part and denied in part.

#### 1.  Olam's Request to Sample and Inspect Coal Cargo Aboard the W-SAPPHIRE

Olam's request for a Rule 27(a) order authorizing the sampling and testing of coal cargo presently stored on the W-SAPPHIRE shall be granted.

First, Olam reasonably expects litigation and arbitration over damages arising from the Incident, including damages to the W-SAPPHIRE, damages to the cargo, delays and disruption in the shipment of the cargo, and other delays that resulted from temporary closure of the port. Questions of causation and liability for these damages will likely turn in part on the quality,

condition, and characteristics of the coal cargo loaded aboard the W-SAPPHIRE. In communications among counsel, Vessel Owners have taken the position that "the cargo loaded [aboard the Vessel] was dangerous" and that they "will hold the Charterers and Shippers fully responsible for all losses and damages sustained by [Vessel] Owners as a result of this incident." Civ. No. 25-3195, ECF No. 21-5. If the coal was in a dangerous state when it was loaded onto the Vessel, or if it was loaded in a way that made it dangerous to store, Vessel Owners will likely seek to recover against Olam, as the head charterer, for damages to the Vessel. Vessel Owners are also likely to seek recovery of at least some portion of any costs they incur for transshipment—i.e., offloading the coal cargo onto another vessel and shipping it to another location. *See* Hearing Tr. at 28:16–25 (counsel for Mercuria stating that Vessel Owners have taken the position that the charterers, including Olam, and shippers are liable for transshipment costs). Any claims by Vessel Owners against Olam would be subject to arbitration, under the terms of their charterparty, rather than litigation in federal court. But Olam may seek contribution or indemnity from Javelin and/or Ultratech, as the owners of the coal. Such claims by Olam against Javelin or Ultratech would not be subject to arbitration and would likely fall within the jurisdiction of a federal court. But Olam "cannot presently bring" any claims for contribution or indemnity, or "cause [them] to be brought[,]" in any forum because, to date, Vessel Owners have not asserted any claims for relief against Olam and the amount of their damages is unknown. Fed. R. Civ. P. 27(a)(1)(A).

Although it is "not absolutely certain" that Olam will be a party to litigation in federal court over the various categories of damages arising from the Incident, "Rule 27 does not require absolute certainty." *M/V Allegra*, 198 F.3d at 485. Olam has presented "a sufficient likelihood" that litigation over the Incident, a maritime casualty "will eventuate[,]" *id.* (quoting *De*

*Wagenknecht*, 250 F.2d at 417), and that anticipated claims for relief by and against Olam will be cognizable in federal court under maritime and admiralty jurisdiction, *see* 28 U.S.C. 1333.

Second, Olam has a reasonable belief that "crucial evidence [is] rapidly disappearing or changing[]" and therefore cannot "wait and see" whether evidence might be available later. *M/V Allegra*, 198 F.3d at 485. There is a sufficient likelihood that, as noted above, the physical quality, condition, and characteristics of the coal cargo loaded onto the Vessel will be central to determining questions of liability for damages caused by the Incident. At present, the coal remains aboard the Vessel, but arrangements have been made to offload it to another vessel imminently for transshipment out of the district.

All expert opinions presented in this matter agree that the physical and chemical properties of coal change over time. *See* Civ. No. 25-3195, ECF No. 13-2 (Jonas Aff.) ¶ 5; ECF No. 17-2 (Allum Decl.) ¶ 7; ECF No. 21-1 (Atherton Second Decl.) ¶ 3. Dr. Atheron testified:

> The coal does change over a period of time, both chemically and physically. There will be oxidation of the coal, there will be loss of moisture from the coal and loss of volatiles which can cause shrinkage and crackage of the coal, and also loss of calorific value. The methane content could drop and the carbon dioxide can decrease with the passage of time. So the sooner the better, as always. These samples are not going to improve with the passage of time.

Hearing Tr. at 117. Similarly, John Allum testified:

> We're never going to be able to say what the conditions exactly were on the 18th because it's changed. It changes over time. What we can do is test what we have, look at those samples, and we can have a comparison, especially if we had a hold—a hold comparison from each hold, we could say is there a difference in the cargo in one hold compared to another hold.

*Id.* at 146.

Given the physical changes the coal has likely undergone since August 16, when it was loaded onto the Vessel, the expert witnesses do not all agree that the coal aboard the Vessel, in its present state, has continuing relevance to determine its condition when the Incident occurred. *Compare* Jonas Aff. ¶¶ 6–8 (concluding that the passage of time would make any samples of coal abord the Vessel not representative of the levels of methane emission of the coal aboard the Vessel at the time of the explosion), *with* Atherton Second Decl. ¶¶ 3–5 (explaining that analysis of the coal can reveal components of gas emanating from the coal that may affect its upper and lower flammable limits, the ignition energy, and autoignition temperature, all of which may be "important in determining why the explosion occurred"). But there is agreement that "the sooner testing is done, the more reliable and relevant its results will be." Hearing Tr. at 117 (Dr. Atheron's testimony); *accord id.* at 146–47 (Mr. Allum agreeing with Dr. Atherton's point that "[t]he sooner the better.").

Olam seeks to access and sample coal from multiple layers within each cargo hold where it is presently stored on the Vessel and to have the samples inspected, measured, and tested. *See* Civ. No. 25-3195, ECF No. 1-2 (Grinwis First Decl.) at 2; ECF No. 21-2 (Atherton Second Decl.) at 2–3. Coal from the top layer of each cargo hold may be sampled at any point between now and the time it is offloaded from the Vessel, while lower layers may be sampled as they are exposed during the offloading process. Sampling and inspecting coal from within each cargo hold is relevant to determine if there are any physical or chemical differences between the coal in hold number 2, where the explosion occurred, and the other cargo holds. *See* Hearing Tr. at 114:9–22 (testimony of Dr. Atherton); *id.* at 146:9–14 (testimony of Mr. Allum); Allum Decl. ¶ 8. Sampling multiple layers within each cargo hold is also relevant to determine physical or chemical variations among the coal loaded onto the Vessel and whether any such differences may be attributed the

coal having been sourced from different mines, which would likely assist the finder of fact in determining whether any of the cargo was dangerous when loaded onto the Vessel. *See* Hearing Tr. at 129:17–18 (testimony of Dr. Atherton); *id.* at 153:1–8 (testimony of John Allum).[8]

Notably, joint testing of the SGS samples have already yielded discrepant results. Dr. Atherton testified that five sample lots were tested, and results for four of the five lots had been obtained by the time of the hearing on October 20. Hearing Tr. at 113. The results show that two lots exhibited high methane and low carbon dioxide, while the other two lots showed the reverse— low methane and high carbon dioxide. *Id.* Dr. Atherton testified that he was "very surprised to find the carbon dioxide much higher than the methane" in two of the sample lots and that these results "may be consistent with … different coals" sourced "from different mines." *Id.* Inspecting samples from multiple layers of the coal stored in the different cargo holds may contribute to a reliable explanation for the discrepancy Dr. Atherton identified.

Notwithstanding the urgency of sampling and testing the coal aboard the Vessel, from the time of the Incident to present date, Vessel Owners have refused to allow samples to be taken of the cargo and have generally stonewalled the other interested parties' efforts to perpetuate evidence. Vessel Owners' refusal to cooperate with these efforts, which has only caused delays in preserving valuable evidence, is precisely the type of "questionable conduct" that the Fourth Circuit found supported granting Rule 27 relief in *M/V Allegra*. 198 F.3d at 485.

Under the circumstances here, I am satisfied that perpetuating the available evidence concerning the present condition of the coal aboard the Vessel "may prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3). Weighing the expert opinions presented to the Court, I find that

---

[8] Sampling from each layer may also relieve Dr. Jonas' concern that, due to its exposure to the elements, coal samples from the surface of the cargo hold number 2 would not be representative of the condition the coal was in on the date of the Incident. *See* Civ. No. 25-3195, ECF No. 13-2 (Jonas Aff.) at 3–4.

14

prompt testing of coal samples will likely yield results that are relevant to determining the physical condition of the coal at the time of the Incident—an issue likely to be central to questions of causation and liability in the anticipated litigation.

Linville, CSXT, and Javelin each oppose Olam's request to sample and test the coal aboard the Vessel on procedural grounds I find to be unpersuasive.

First, they argue that Olam's petition must fail because no party adverse to Olam resides in this district. *See* Linville Opp'n at 4–5; ECF No. 14 (CSXT Resp.) at 5–6; Javelin Opp'n at 10–11. Rule 27(a) provides that the petition may be filed "in the district court for the district where any expected adverse party resides." Fed. R. Civ. P. 27(a)(1). As explained above, Vessel Owners, Javelin, and Ultratech are each expected to be adverse to Olam in anticipated litigation arising from the Incident.[9] Each of these potential adverse parties is a foreign entity with no apparent residency within the United States. By their reasoning, a Rule 27(a) petition by Olam could not be sustained in any district court in the country.

I find that Rule 27(a)'s residency provision must be construed with some degree of flexibility to achieve the Rule's purposes. All Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action or proceeding." Fed. R. Civ. P. 1. And among the principal purposes of the Federal Rules is to promote basic fairness and due process. *See In re Rivada Networks*, 230 F. Supp. 3d 467, 473 (E.D. Va. 2017) (citing *Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 717 n.6 (4th Cir. 1983)). In *De Wagenknecht*, the D.C. Circuit stated that, in cases lacking an adverse

---

[9] Olam also identifies CSXT, a Virginia corporation with principal office in Baltimore, Maryland, as a potential adverse party based on the theory that it may have blended or otherwise mishandled the coal in some way that made it dangerous. But no evidence has been presented to suggest that CSXT, as a common carrier, is likely to be liable for any such blending or mishandling. *See* Hearing Tr. at 50:14–20, 88:25–89:1; 140:22–141:8; 194:16–195:19.

party who is a resident of any federal district, "the proceedings for perpetuation should not fail for lack of a proper district, provided there are proper safeguards as to notice and service of process, or other method of bringing the proceeding to the attention of the nonresident aliens. In such case, and under the above conditions, the filing of the proceeding may be accomplished in *any Federal District Court*." 250 F.2d at 418 (emphasis added).

Here, Vessel Owners, Javelin, and Ultratech each received timely notice of the Olam Petition, was represented by counsel and was heard through counsel during a remote show cause hearing held on the same date the petition was filed, filed a written response to the petition, and participated in a hearing on the petition, which gave each party an opportunity to present evidence and oral argument. Although none of these potential adverse parties is a resident of this district, or any other federal district, they were afforded all necessary procedural safeguards as to notice, service, and opportunity to be heard. Any argument that the Olam Petition should have been filed in another district is meritless. The Incident expected to give rise to the anticipated litigation occurred in this district, damages to the Vessel and the cargo occurred in this district, and the Vessel remains in this district, as does the cargo Olam seeks to have sampled and inspected. In this context, I find that the adverse parties' lack of residency in the United States cannot disqualify the Olam Petition. See *De Wagenknecht*, 250 F.2d at 418.

Next, Linville and Javelin each argue that Olam cannot pursue Rule 27 relief "against" Vessel Owners given the arbitration provision in Vessel Owners' charterparty with Olam. *See* Linville Opp'n at 2; Javelin Opp'n at 11. Linville further argues that the arbitration provision precludes litigation of any dispute between it and Olam in federal court and, therefore, Olam is disqualified from Rule 27 relief based on the prospect of any such litigation. Linville Opp'n at 3–4. But I do not view the Olam Petition as seeking relief "against" Linville. Rule 27(a) requires a

petitioner to identify adverse parties to anticipated litigation, and Olam has identified adverse parties—Javelin and Ultratech—with whom Olam does not have any binding arbitration agreement. Moreover, Rule 27(a) is not a mechanism through which a party seeks a substantive remedy "against" any other party; rather, it is a procedural rule authorizing court orders to perpetuate evidence. The Rule incorporates by reference other rules of discovery, including Rules 34 and 35. *See* Fed. R. Civ. P. 27(a)(3). Rule 34, for its part, specifically provides that "a *nonparty* may be compelled to produce . . . tangible things or to permit an inspection[,]" "[a]s provided in Rule 45[.]" Fed. R. Civ. P. 34(c) (emphasis added). Thus, Olam and Linville need not be adverse parties in anticipated litigation for Olam to seek and obtain a Rule 27(a) order compelling Linville to permit sampling and inspection of the coal cargo stored on its Vessel. The Rule only requires that the requested sampling and inspection be "likely to provide material" that is relevant and "distinctly useful to a finder of fact[]" in litigation Olam reasonably anticipates between itself and Javelin and Ultratech. *M/V Allegra*, 198 F.3d at 486–87 (quoting *In re Bay Cnty. Middlegrounds Landfill Site*, 171 F.3d at 1047).

Further, even if potential litigation between Olam and Linville was the only anticipated litigation Olam could identify as grounds for pre-suit sampling and testing of the coal cargo, these parties' arbitration agreement would not necessarily disqualify Olam from the Rule 27(a) order it seeks. Although Rule 27(a) requires a petitioner to demonstrate that it "expects to be a party to an action cognizable in a United States court[,]" Fed. R. Civ. P. 27(a)(1)(A), the Fourth Circuit has held that Rule 27(a) perpetuation of evidence "in aid of arbitration" may be justified by "extraordinary circumstances" and "special need," *M/V Allegra*, 198 F.3d at 479–81. In *M/V Allegra*, the Fourth Circuit found, notwithstanding the prospect of arbitration, "extraordinary circumstances" and a "special need" sufficient to justify Rule 27(a) relief where the petitioner

17

"sought evidence from a ship that was soon leaving United States waters[;]" "requested perpetuation of evidence that, if not preserved, was going to disappear or be materially altered[;]" showed that the evidence it sought "was necessary to its arbitration claim[;]" and "was reasonably uncertain whether it could timely preserve the evidence outside the district court." *Id.* at 481. Likewise, here, without a Rule 27(a) order, the coal cargo presently aboard the Vessel will be offloaded onto another vessel and shipped to its destination beyond this jurisdiction and beyond Olam's reach. Even if the coal somehow remained available for the foreseeable future, according to every expert witness presented in this matter, it would be "materially altered" by the passage of time. *Id.* As explained *supra*, Olam has made an adequate showing that sampling and testing the coal cargo is necessary to ascertain whether the coal in cargo hold number 2 was dangerous when the explosion occurred, as Vessel Owners contend. And, given Vessel Owners' refusal to permit sampling and testing of the coal, a Rule 27(a) order from this Court is the only practically available means by which Olam can ensure perpetuation of this potentially critical evidence. Accordingly, I find a Rule 27(a) order compelling pre-suit sampling and testing of the coal cargo to be justified by Olam's "special need" for such an order in the "extraordinary circumstances" presented in this case. *Id.*

The Court is mindful, however, that "Rule 27 is not a substitute for broad discovery, . . . nor is it designed as a means of ascertaining facts for drafting a complaint," *id.* at 485–86 (citations omitted), nor is it "meant to allow parties to circumvent the discovery procedures of arbitral forums[,]" *id.* at 487. Put differently, the Rule is not meant to "place [a petitioner] in a better position than it held before it filed its Rule 27 petition." *Id.*; *see also In re I-35W Bridge Collapse Site Inspection*, 243 F.R.D. 349, 352–53 (D. Minn. 2007) ("[T]o allow Rule 27 to be used for the purpose of discovery before an action is commenced to enable a person to fish for some ground

for bringing suit would be 'an abuse of the rule.'") (quoting *In re Landry–Bell*, 232 F.R.D. 266, 267 (W.D. La. 2005)). Rather, the Rule is meant to perpetuate available evidence that is at risk of being lost before suit is filed.

To avoid potential misuse of the evidence perpetuated through sampling and testing the coal cargo, I will direct that the coal samples be held in the exclusive custody of an independent third-party testing company and that the test results be produced exclusively to the Court, where they shall be held *in camera*.[10] The Court will maintain custody of the inspection results until after a judicial or arbitral proceeding is instituted and a court, arbitrator, or party requests this documentation for any proper use in the proceeding. *See id.* at 481 n.10 (affirming the district court's decision to hold the evidence "*in camera* away from the eyes of either party[]" until "the arbitrator decides to unseal it[,]" thus "preserving [the] evidence for the arbitrator's determination of its usefulness"). Preserving the coal testing results *in camera* serves Rule 27's purpose of avoiding loss of potentially crucial evidence while, at the same time, avoiding misuse of the Rule as a means for improper pre-suit discovery.

## 2. Olam's Request to Inspect Coal Samples from the CSSC ROTTERDAM

The Olam Petition further seeks court authorization to access and inspect samples taken from the coal cargo loaded onto the CSSC ROTTERDAM vessel and owned by Javelin. Olam argued in its briefing that testing those samples will yield relevant evidence because the coal loaded onto the CSSC ROTTERDAM was drawn from the "same pile" as the coal loaded onto the W-SAPPHIRE. Olam Mem. at 8.

---

[10] Olam and the other interested parties will be directed to seek agreement on a protocol for sampling coal before and/or during the offloading process and preservation and testing protocols for the coal samples.

In response to the Olam Petition, CSXT represents that the coal stockpile at the Curtis Bay terminal is continuously replenished with coal from different railcars, which may carry coal from different mines, to build up the quantity of coal necessary to load the next ship. CSXT Resp. at 4. Therefore, the coal stockpile is "a continually changing variable driven by the need to add a sufficient quantity of coal to load each incoming vessel and allow for off-loading of incoming train loads." *Id.* At the hearing on the Rule 27 petitions, Javelin's counsel presented an email from CSXT proffering that the coal stockpile at issue was substantially depleted after the coal was loaded onto the W-SAPPHIRE and subsequently replenished before coal was loaded onto the CSSC ROTTERDAM. *See* Hearing Tr. at 60–61. Specifically, the stockpile totaled more than 108,000 tons of coal before the W-SAPPHIRE was loaded, and more than 83,000 tons of that coal was loaded onto the W-SAPPHIRE on August 18, leaving approximately 25,000 tons. *Id.* at 61. The stockpile was then replenished and totaled close to 126,000 tons before the CSSC ROTTERDAM was loaded on August 26, and less than 5,000 tons remained after loading that vessel. *Id.* The Court has been presented with no evidence or reason to believe that the supplies of coal loaded onto both vessels were sourced from the same mines.

There is no evidence to support any probability that the supplies of coal loaded onto the two vessels bear any relation to one another. Olam fails to meet its burden of showing that inspecting samples of coal from the CSSC ROTTERDAM would yield evidence that is relevant or that it is "likely to provide material distinctly useful to a finder of fact." *M/V Allegra*, 198 F.3d at 486–87 (quoting *In re Bay Cnty. Middlegrounds LandfillSite*, 171 F.3d at 1047). Indeed, Olam's own expert Dr. Atherton testified, "Based on the records I've seen from the stockpile of how it's moved, I don't see the particular relevance in the Rotterdam." Hearing Tr. at 152:17–21.

Accordingly, Olam's request to perpetuate evidence through inspection of the coal samples from the CSSC ROTTERDAM must be denied.

### 3. Olam's Requests for Depositions of Corporate Designees and Production of Documents

The Olam Petition further seeks to perpetuate the testimony of corporate designees of CSXT and Javelin about whether the coal cargo loaded onto the W-SAPPHIRE and the CSSC ROTTERDAM was blended and about the loading sequence and ventilation of the coal on the two vessels. Olam Mem. at 15–16. Additionally, Olam seeks production of certain documentary, electronic, and video evidence presently in the custody of CSXT, including any documentation of the arrival, loading, and departure of both the W-SAPPHIRE and the ROTTERDAM, as well as certain gas monitoring information and documentation from CSXT's facility in August 2025. *Id.* at 16–17.

Olam fails to explain why the requested testimony and evidence is at risk of being lost. CSXT is a Virginia corporation that continues to conduct business and maintain a stable presence in Maryland, well within reach of the Court's subpoena power and subject to the Court's jurisdiction for any claims that may arise from CSXT's activities in Maryland. Further, CSXT has agreed to retain and preserve the materials Olam seeks in its petition. *See* CSXT Resp. at 3; Hearing Tr. at 195:20–24. A Rule 27(a) order directing CSXT to produce the evidence Olam seeks would be both unnecessary and improper. *See Application of Checkosky*, 142 F.R.D. 4, 6 (D.D.C. 1992) ("The purpose of Rule 27 is simply to preserve evidence that otherwise would be in danger of being lost."). Accordingly, Olam's Rule 27(a) requests for depositions and production of evidence must be denied.[11]

---

[11] Olam suggests there is a risk the evidence it seeks will be lost because CSXT and/or Javelin have already failed to preserve the coal stockpile at the Curtis Bay terminal, despite receiving notice of Olam's desire to sample and test coal from the stockpile. *See* Civ. No. 25-3195, ECF No. 21 (Olam Reply) at 13;

* * * * *

In sum, the Olam Petition shall be granted in part and denied in part. The Court shall issue a Rule 27(a) order authorizing an independent third party to take samples of multiple layers of the coal cargo presently stored in each cargo hold of the W-SAPPHIRE and to inspect the samples in accordance with a sampling and testing protocol to be proposed by the interested parties. Thereafter, the test results shall be submitted to the Court and held pending a request for production after a judicial or arbitral proceeding commences. In all other respects, the Olam Petition shall be denied.

### B.  The Mercuria Petition

In a single petition verified by Mercuria's Director, on behalf of Mercuria, Javelin, and Ultratech (collectively, "Mercuria Petitioners"), these petitioners request a court order under Rule 27(a): (1) authorizing depositions upon oral examination of the Vessel's master, chief officer, chief engineer, and "relevant crew";[12] (2) authorizing an independent marine inspection of the Vessel; and (3) directing preservation and production of certain documents, records and communications, including cargo logs, stowage and ventilation plans and records, gas-monitoring data, SMS/ISM checklists, cargo safety data, and related operational records. *See* Civ. No. 25-3207, ECF No. 1 (Mercuria Pet.) at 4–5. Vessel Owners oppose the Mercuria Petition, arguing that certain

---

Olam Mem. at 7. The record leaves unclear when notice, if any, was received by CSXT relative to when the coal stockpile was replenished. Continuous depletion and replenishment of the coal stockpile appears to be part of CSXT's normal operations, and Olam has presented no evidence that CSXT ever agreed to preserve the coal stockpile in any way. Whether CSXT had any obligation to halt its normal operations, what created any such obligation, and when it was created are unclear. I am left with no reason to doubt CSXT's commitment to preserve the evidence Olam requests in its petition.

[12] Since filing of the Mercuria Petition, Mercuria Petitioners and Vessel Owners have jointly filed a stipulation with an exhibit that specifically identifies members of the Vessel's crew by name, date of birth, and other identifiers. *See* Joint Stipulation, Ex. A. Given the sensitive nature of some of the personally identifying information, the Court will order sealing of this exhibit and direct the parties to file a redacted version.

procedural requirements for Rule 27(a) relief are not met and that the Rule only permits perpetuation, and not production, of evidence. Civ. No. 25-3207, ECF No. 15-1 (Vessel Owners Opp'n). For the reasons explained below, and subject to the constraints stated herein, I find that Rule 27(a)'s procedural requirements are satisfied, and the relief Mercuria Petitioners seeks is warranted to prevent a failure or delay of justice. Therefore, the Mercuria Petition shall be granted.

Like Olam, Mercuria Petitioners reasonably expect litigation and arbitration over damages arising from the Incident, including damages to the Vessel, damages to the cargo, delays and disruption in the shipment of the cargo, and other delays that resulted from temporary closure of the port. Mercuria Pet. at 3. Questions of liability for these damages will likely turn in part on events and conduct of members of the Vessel's crew leading up to and at the time of the Incident, as well as the general seaworthiness of the Vessel and the condition and operability of equipment aboard the Vessel. A Port State Control Report of Inspection completed by the U.S. Coast Guard indicates that the chief mate "fail[ed] to demonstrate the calibration of gas detection equipment twice" during calibration tests conducted in connection with an inspection of the Vessel on August 22, four days after the Incident. Civ. No. 25-3195, ECF No. 25-3. "It was observed during both calibration tests, the gas detection equipment was reading inconsistent span gas numbers indicating the equipment was not operating as intended." *Id.* If the Incident was caused by an unseaworthy condition or operational issue on the Vessel, then Ultratech may seek to recover against Vessel Owners and/or the charterers for failure to safeguard its cargo. *See* Hearing Tr. at 13–14 (discussing potential claim for failure to safeguard cargo). In that case, the charterers may seek indemnity or contribution from Vessel Owners. However, Mercuria and Javelin "cannot presently bring" any such claims, or "cause [them] to be brought[,]" Fed. R. Civ. P. 27(a)(1)(A), because

Ultratech has not initiated any litigation against them, the quantum of any claims for damages has not been determined, and the Incident remains under investigation.

In addition, as noted in Part III.A.1 *supra*, Vessel Owners will likely seek recovery against Mercuria Petitioners "for all losses and damages sustained by [Vessel] Owners as a result of [the Incident,]" Civ. No. 25-3195, ECF No. 21-5, including damages to the Vessel and at least a portion of transshipment costs, *see* Hearing Tr. at 28:16–25 (counsel for Mercuria stating that Vessel Owners have taken the position that the charterers and shippers are liable for transshipment costs). But, as potential defendants, Mercuria Petitioners cannot cause Vessel Owners to initiate litigation against them.[13]

Notably, Mercuria Petitioners are not bound by any arbitration agreement with Vessel Owners, so their claims against Vessel Owners, and Vessel Owners' claims against them, are cognizable in federal district court pursuant to admiralty and maritime jurisdiction. *See* 28 U.S.C. 1333. Again, "Rule 27 does not require absolute certainty[]" that any of the petitioners will be party to litigation in federal court. *M/V Allegra*, 198 F.3d at 485. Mercuria Petitioners have satisfied the Rule 27 standard by presenting "a sufficient likelihood" that litigation over the Incident "will eventuate[,]" *M/V Allegra*, 198 F.3d at 485 (quoting *De Wagenknecht*, 250 F.2d at 417), and that anticipated claims for relief by and/or against them will be cognizable in federal court.[14]

---

[13] As discussed at length during the hearing, Ultratech, as the bill-of-lading holder and owner of the coal cargo, presently has the ability to bring claims under the Carriage of Goods by Sea Act against the Vessel *in rem* and against Vessel Owners and/or the charterers *in personam* for damages to its cargo. *See* 46 U.S.C. § 30701 (note). At the hearing, counsel for Mercuria Petitioners questioned the wisdom of doing so, but no counsel doubted that Ultratech presently has a *prima facie* case it could file. Still, Vessel Owners' contention that the coal cargo owned by Ultratech "was dangerous" exposes Ultratech to liability for Vessel Owners' "losses and damages," Civ. No. 25-3195, ECF No. 21-5; *see also* Hearing Tr. at 49:22–50:10, and, as a potential defendant, Ultratech cannot cause Vessel Owners to initiate ligation against itself.

[14] As with the Olam Petition, Vessel Owners object that the Mercuria Petition fails to identify an adverse party who resides in this district. Indeed, Linville has an address in Liberia, and W-Marine resides

24

Further, Mercuria and Javelin have made a sufficient showing that crucial testimony and evidence is at great risk of being lost in the absence of Rule 27(a) relief. As noted above, events on the Vessel and the conduct of the Vessel's crew surrounding the Incident, and the condition and operability of the Vessel and equipment on the Vessel, will be central to questions of causation and liability in the anticipated litigation. But the only witnesses with personal knowledge of the events on the Vessel surrounding the Incident and the condition and operability of the Vessel and the equipment at the time of the Incident—the members of the Vessel's crew—are all foreign nationals with no apparent ties to the United States. *See* Civ. No. 25-3207, ECF No. 21, Ex. A (listing crew members' names, their nationalities as Filipino, and their places of "sign on" as various locations outside the United States). The crew members are presently in the United States, living aboard the Vessel, and, according to a stipulation reached between the parties, Vessel Owners will not act to repatriate them until after the Court issues a ruling on the Mercuria Petition. Joint Stipulation at 2. But if the Court denies the Mercuria Petition, any crew member may be repatriated at any point, and the crew would likely leave the jurisdiction as soon as the Vessel receives the U.S. Coast Guard's permission to set sail. Either way, if the petition is denied, the only witnesses to the events on the Vessel surrounding the Incident would probably go beyond the

---

in Greece. But, as explained in Part III.A.1 *supra*, a Rule 27(a) petition "should not fail for lack of a proper district[]" merely because the adverse parties are foreign entities that do not reside in any federal district. *De Wagenknecht*, 250 F.2d at 418. The D.C. Circuit has held that, in cases like this, Rule 27(a)'s residency provision is not a bar to relief in "any Federal District Court[,]" as long as "there are proper safeguards as to notice and service of process, or other method of bringing the proceeding to the attention of the nonresident aliens." *Id.* Here, Vessel Owners have received all procedural safeguards, including notice of the Mercuria Petition and a full opportunity to participate in the proceeding and be heard. Moreover, the Incident expected to give rise to litigation occurred in this district, the damages were primarily sustained in this district, the Vessel remains in this district, and the perpetuation of testimony and evidence sought in the Mercuria Petition would be effectuated in this district. In this context, Vessel Owners' lack of residency in the United States cannot disqualify the Mercuria Petition.

reach of any federal court's subpoena power, with no likelihood of return, and their testimony would be lost.

This testimony is obviously critical to the anticipated litigation. The personal knowledge of these witnesses is unique to them and not likely to be held by any other witnesses who will remain within reach of any federal court's subpoena power. Their testimony from personal knowledge is competent and likely relevant and material to establishing cause(s) of the Incident. And Vessel Owners have not voluntarily permitted or facilitated the depositions Mercuria Petitioners seek. Therefore, I find that ordering perpetuation of crew members' testimony at this time is necessary to "prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3). Denying relief under Rule 27 would likely result in the loss of crucial evidence of what caused the Incident that is needed to make a just determination of liability for damages in anticipated litigation. Indeed, several courts have reasoned that Rule 27 relief is warranted "'where a vessel with crew members possessing particular knowledge of the dispute is about to leave port,' or where there is a 'special need for information which will be lost if action is not taken immediately.'" *In re Campania Chilena de Navegacion*, No. 03 CV 5382 (ERK), 2004 WL 1084243, at *3 (E.D.N.Y. Feb. 6, 2004) (citing *M/V Allegra*, 198 F.3d at 473)); *see also Koch Fuel Int'l v. M/V South Star*, 118 F.R.D. 318, 320 (E.D.N.Y. 1987) ("One of the 'exceptional circumstances' in which discovery has been deemed proper is where a vessel with crew members possessing particular knowledge of the dispute is about to leave port.") (citation omitted).

By the same token, ordering preservation and production of documentation of the events on the Vessel surrounding the Incident, which is itemized in Exhibit 1 to the Mercuria Petition and includes any written statements of crew members concerning those events, Civ. No. 25-3207, ECF No. 1-4, is necessary to perpetuate the crew members' testimony. Exhibit 1 lists documents such

as incident reports, communications and statements by crew members from the period surrounding the Incident, monitoring logs and sensor data from the period surrounding the Incident, internal investigation reports, operational and maintenance records, and materials exchanged with the U.S. Coast Guard. *Id.* This documentation remains in the exclusive custody and control of Vessel Owners, and they have not voluntarily produced it upon Mercuria Petitioners' request. These documents, records, and communications must be produced to Mercuria Petitioners to permit effective depositions of the crew members. *See Application of Deiulemar Di Navigazione S.p.A.*, 153 F.R.D. 592, 593–94 (E.D. La. 1994) (ordering relevant vessel documents to be produced in connection with Rule 27 depositions of crew members).

I note that Exhibit A to the Joint Stipulation lists 23 members of the Vessel's crew. *See* Joint Stipulation, Ex. A. Mercuria Petitioners have not requested depositions of all 23 crew members, and it would be unduly burdensome and a waste of time and resources to authorize 23 depositions at this time. The Mercuria Petition expresses specific interest in deposing "the Vessel's master, chief officer, [and] chief engineer," Mercuria Pet. at 4, each of whom is identified by name and other means in Exhibit A to the stipulation, *see* Joint Stipulation, Ex. A. Depositions of these three witnesses will be authorized. Their testimony shall be restricted to facts material to the explosion that occurred on August 18, 2025, including cargo loading, stowage, ventilation, inerting, gas monitoring, and related shipboard operations. The depositions will be taken orally for purposes of efficiency and expediency, and in consideration of the complexity of the subject matter.

The Mercuria Petition also seeks depositions of "relevant ventilation/electrical personnel" who are neither identified by name, rank, or position, nor described with any specificity. Mercuria

Pet. at 4. Rule 27(a) requires identification of each deponent; therefore, Mercuria Petitioners' request to depose unspecified "ventilation/electrical personnel" must be denied.[15]

In addition, the Mercuria Petition seeks an order under Rules 27 and 34 permitting entry onto the Vessel by an independent marine surveyor to inspect, measure, survey, photograph, test, and/or sample identified parts of the Vessel and property on it. Through this inspection, the petitioners seek to perpetuate evidence concerning the cause of the Incident. The Court finds the requested inspection to be warranted because the physical characteristics of the Vessel and equipment on the Vessel is likely to be altered imminently through repairs that have been ordered through a Captain of the Port Order issued by the U.S. Coast Guard. *See* Civ. No. 25-3195, ECF No. 25-3. Once the repairs are conducted and other alterations are made to the Vessel and its equipment, presently available information about their physical condition and operability prior to, and in the aftermath of, the explosion will be lost and cannot be recreated. That information is likely to be competent, relevant, and material to any reliable assessment of causation and just determination of liability in the anticipated litigation. Again, Vessel Owners have not voluntarily permitted the inspection Mercuria Petitioners seek. Therefore, Rule 27(a) relief is necessary to "prevent a failure or delay of justice." Fed. R. Civ. P. 27(a)(3). *See also M/V Allegra*, 198 F.3d at 487 (permitting a vessel inspection was not an abuse of discretion where petitioner's need to perpetuate evidence on the vessel could not "easily be accommodated by other potential evidence") (citation modified); *Ferro Union Corp. v. S.S. Ionic Coast*, 43 F.R.D. 11, 14 (S.D. Tex. 1967) (allowing depositions and inspection of the vessel and its cargo because "[t]o deny discovery here could well mean that the information sought would never be available"). The Court will issue an

---

[15] This denial will be without prejudice to any prompt request for a further Rule 27(a) order authorizing limited and non-cumulative depositions of a reasonable number of *identified* ventilation/electrical personnel should the need to perpetuate their "known" testimony to "prevent[] a failure or delay of justice" be demonstrated to the Court's satisfaction. *M/V Allegra*, 198 F.3d at 483.

order authorizing an inspection and survey of the Vessel by an independent marine surveyor and directing the production of relevant documents requested by the surveyor.

However, as with the sampling and testing of the coal cargo, *see* Part III.A.1 *supra*, the Court will order submission of any marine inspection report, photographs, and test results generated from the inspection, and documents produced to the surveyor in connection with the inspection, to the Court to be held *in camera* pending any request for production by a court, arbitrator, or party after a judicial or arbitral proceeding is instituted. Any physical samples taken by the surveyor shall be preserved in the surveyor's exclusive custody until further order the Court. These restrictions on the parties' access to fruits of the marine inspection is designed to avoid misuse of the Rule 27(a) process to obtain "broad discovery" pre-litigation, *M/V Allegra*, 198 F.3d at 485–86, and needlessly "plac[ing] [Mercuria Petitioners] in a better position than [they] held before [they] filed [their] Rule 27 petition[,]" *id.* at 487; *see also In re I-35W Bridge Collapse Site Inspection*, 243 F.R.D. at 352–53; *In re Landry–Bell*, 232 F.R.D. at 267. The Court will maintain custody of the test results until after a judicial or arbitral proceeding is instituted and a court, arbitrator, or party requests this documentation for any proper use in the proceeding. *See id.* at 481 n.10 (affirming the district court's decision to hold the evidence "*in camera* away from the eyes of either party[]" until "the arbitrator decides to unseal it[,]" thus "preserving [the] evidence for the arbitrator's determination of its usefulness"). Mercuria Petitioners and Vessel Owners will be directed to confer in good faith to identify and engage a marine surveyor to conduct an independent inspection of the Vessel, and to seek agreement as to the timing of the inspection and depositions.[16]

---

[16] The parties shall submit a joint status report memorializing their agreement on these issues with a proposed order and/or briefing on any issues that remain in dispute.

IV.    **CONCLUSION**

For the foregoing reasons, the Olam Petition will be granted in part and denied in part, and the Mercuria Petition will be granted with the restrictions described in this Memorandum Opinion. Separate orders will issue as to each petition.

    11/10/25
Date

    Matthew J. Maddox
United States District Judge